## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------

LEE Xu,                                                )
                                                       )
                              Plaintiff,               )
        -against-                                      )
                                                       )
DIREXION SHARES ETF TRUST, RAFFERTY )
ASSET MANAGEMENT, LLC, DIREXION        )
FAMILY OF INVESTMENT COMPANIES,        )
DANIEL O'NEILL, DANIEL J. BYRNE,        )
GERALD E. SHANLEY, III, JACOB C. GAFFEY, )
PATRICK J. RUDNICK, ANGELA              )
BRICKL, TODD KELLERMAN, PAUL           )
BRIGANDI, TONY NG, MICHAEL RAFFERTY, )
KATHLEEN RAFFERTY HAY, U.S. BANCORP )
FUND SERVICES, LLC, FORESIDE FUND      )
SERVICES, LLC, DIREXION ADVISORS, LLC, )
                              Defendants.              )

-------------------------------------------------------------

CIVIL ACTION NO.:  1:22-cv-5090-VEC

__**AMENDED COMPLAINT**__

__**TRIAL BY JURY DEMANDED**__

This Amended Complaint is the First Amendment as a Matter of Course before the defendants answer the Complaint pursuant to Rule 15(a)(1) of the Federal Rule of Civil Procedure.

Plaintiff, pro se, alleges the following, based on his investigation, documents filed with the United States Securities and Exchange Commission ("SEC"), reports, reviews, and news published in the press, and information obtained by the plaintiff.

## I.      __SUMMARY OF ACTION__

1.      This is an action related to Direxion Daily Gold Miners Index Bull 2X Shares (the "NUGT," formerly "Direxion Daily Gold Miners Index Bull 3X Shares" before March 31, 2020), Daily Junior Gold Miners Index Bull 2X Shares (the "JNUG," formerly "Daily Junior Gold Miners Index Bull 3X Shares" before March 31, 2020), and other Direxion leveraged ETFs, 3X or 2X actively managed exchange-traded funds ("ETFs" or "Funds") offered by Direxion Shares ETF

Trust ("Direxion" or the "Trust"), pursuant to Direxion's false and misleading statements in all Prospectuses, traceable Form N-1A Registration Statements, Amendment No. 260, 262 on February 27, 2020, Amendment No. 285 & 287 on December 30, 2021, and other post-effective Amendments, Statements of Additional Information and other Exchange Act filings (collectively, the "Disclosure Statements"), also price manipulation, fraudulent, deceptive tactic in the purchase and sale of the security.

2.      Plaintiff is seeking to pursue remedies under Section 11 of the Securities Act of 1933 (15 U.S.C. §775), Securities Act Section 15 (15 U.S.C. § 77o), Sections 9(a)(2) of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78i(a)(2)], Exchange Act Section 9(f) [15 U.S.C. § 78i(f)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], Exchange Act Section 18(a) [15 U.S.C. § 78r(a)], Exchange Act Section 20(a) [15 U.S.C. § 78t(a)], Exchange Act Section 20A [15 U.S.C. § 78t-1(a)], (the "Exchange Act") and Rule 10b-5 [17 C.F.R. § 240.10b-5]. This action asserts strict liability claims against Defendants; also, civil damages, penalties, injunctive relief against Defendant for the materially false and misleading statements, and market manipulation (defined below).

3.      Direxion offered a series of leveraged ETFs, including the NUGT, JNUG, JDST, and DUST, regulated by the SEC under the Investment Company Act of 1940 (the "1940 Act"), publicly listed and traded and tracking a corresponding underlying index. These ETFs have attracted significant investors, institutionally or individually.

4.      JNUG & NUGT are listed on the NYSE Arca. The Fund issues and redeems Shares only in large blocks of Shares as "Creation Units." Claimed in 485 Direxion Prospectus on December 30, 2020, each Creation Unit comprises 50,000 shares. There is no minimum investment, and brokerage firms allow investors to trade in smaller "odd lots" at no per-share price

differential. Shares of the leveraged Funds are listed and traded like publicly traded stocks, and most investors will buy and sell Shares of the Fund in the secondary market through brokers.

5.    Most of Direxion's leveraged ETFs are offered as pairs of funds: Bull and Bear, to track a directional leveraged or inverse leveraged price performance of an index, as claimed in Direxion's Statement of Additional Information ("SAI") dated 12/30/2020. The NUGT & DUST and JNUG & JDST are two Bull and Bear pairs of Direxion's leveraged directional ETFs.

6.    Claimed in 485 Direxion Prospectus on December 30, 2020, the Fund is a "non-diversified" series of the Trust because a relatively high percentage of its assets may be invested in the securities of a limited number of issuers or derivatives. Thus, the Funds are leveraged underivatives of derivatives. Direxion defined these two pairs of Funds as "Gold" Miner ETFs, but the weight of actual gold miners' assets in their derivative investment portfolio may be very limited.

7.    After April 1, 2020, The NUGT and DUST seek investment results that correspond to two times (200%) or two times the inverse of (-200%) the daily performance of the NYSE Arca Gold Miners Index (GDMNTR, or "Miners Index"); through March 31, 2020, NUGT and DUST sought daily leveraged investment results, before fees and expenses, of 300% or -300%, of the performance of the GDMNTR. GDMNTR is a modified market capitalization-weighted Index comprised of publicly traded companies that operate globally in both developed and emerging markets and are involved primarily in the mining for gold and, to a lesser extent, in mining for silver (NUGT Summary Prospectus on February 28, 2021). The Index GDMNTR is not a pure gold miner's Index, and NUGT invests part of its portfolio into the GDMNTR and relevant derivatives.

8.    After April 1, 2020, JNUG and JDST track two times (200%) or two times the

inverse of (-200%) of the daily performance of the MVIS Global Junior Gold Miners Index (MVGDXJTR, or "Junior Miners Index"); through March 31, 2020, JNUG and JDST sought daily leveraged investment results, before fees and expenses, of 300% or -300%, of the performance of the MVGDXJTR. MVGDXJTR tracks the performance of foreign and domestic micro-, small- and mid-capitalization companies that generate, or demonstrate the potential to generate, at least 50% of their revenues from, or have at least 50% of their assets related to, gold mining and/or silver mining, hold real property or have mining projects that have the potential to produce at least 50% of the company's revenue from gold or silver mining when developed, or primarily invest in gold or silver. Index MVGDXJTR is not a pure gold miner's Index, and JNUG invests part of its portfolio into the Index and other derivatives.

9.      Direxion defined the terms "daily," "day," and "trading day," which refers to the "period" from the close of the markets on one trading day to the close of the markets on the next trading day.

10.      Affiliate with other market makers, Direxion controls and manipulates the Fund price, including the intraday price, pre-closing violent swing trading, pre-market and after-market time trading, long-term price slipping down, the forward and reverse splits, making them patterns in short-term, middle-term, and long-term price manipulation.

11.      NUGT has its price trending down by 1250 times, or -99.92%, from $78,019.00 to $59.89 as of June 24, 2021, since its inception on December 8, 2010. By May 14, 2021, the value of NUGT shrunk to 0.008% or 0.0008 of its original value. JNUG shrunk 99.76%, JDST shrunk almost 100%, and DUST shrunk 99.93% since inception. Both bull and bear paired funds are all sure downside trend funds. If some did not trend down, they were subject to further manipulation intended as sway-trade and upside-trade funds.

12.    Direxion has approximately $6.2 billion of managed assets as of October 31, 2009. As of 06/24/2021, NUGT has significantly accumulated assets to 924.55M, total Assets: 12,294.50M, Holdings Turnover: 333.00%; Average Volume: 2,446,789, Expense Ratio (net): 1.14%.

13.    Direxion made this by hidden mathematic defects in the design, and mostly to make the shorting profit faster and bigger, by short-term, middle-term, and long-term price manipulation.

14.    Direxion provides partial information of enlarged volatility and compounding to deceive the public investors, hiding the profound compounding effect of long-term loss of the Funds.

15.    Direxion provided fraudulent and misleading information in its public disclosures, from the registration to the following SEC information disclosures, that long-term investments may receive higher returns or at least have similar win-loss return opportunities.

16.    Direxion provides pairs of leveraged funds to mislead the market to buy long respective directional funds. However, All Direxion 3x or 2x leveraged ETFs, both bull and bear, by design, are shorting tools. Direxion and all responsible defendants knew either in Funds' design or operation and tried to cover the truth in its public disclosures.

17.    Direxion misrepresented that the Funds are seeking daily leveraged return and named the Funds as "Daily." However, the Funds' price cannot be leveraged during the trading day period other than the pinpointed closing time, when Direxion rebalances and readjusts its position.

18.    Therefore, the Funds mislead and misrepresent their names by claiming "daily," "Leverage," "Bull/Bear," and "Gold Miners."

19.    Direxion manipulates the intraday prices to mimic the underly indexes' trend while investors do not know. Direxion controls the closing prices to deviate from the leveraged return.

Direxion manipulates the rebalance and readjustment of the closing price to make short-swing trade profits.

20.    Direxion utilizes the reverse split and forward split to manipulate the market price further and collect additional profit from the investors.

21.    Direxion practiced all tactics to deceive and mislead investors, control and manipulate prices, hunt short-term, long-term, and middle-term profit, and make the trend serve its illegal market manipulation purposes.

22.    Plaintiff purchased the Funds without knowledge of the serious down risks of the Funds, without knowledge of the severe downside risks of both bull and bear funds, without knowledge of the price manipulation by the defendants, without knowledge of the minimum share of gold assets and underlying index in the Funds' holding portfolios, without knowledge of the cheating and stealing in the splits, without knowledge of the cheating in the Funds' names, without knowing that the Funds can only be leveraged at the closing time, without knowing that the funds cannot follow the underlying benchmark trend in shorter and longer term than one day, without knowing that defendants throw all its operational and investment cost and loss into daily closing price readjustment with no cap, and without knowing that defendants hedge against investors for their significant derivative investment rolling costs and losses.

## II.    JURISDICTION AND VENUE

23.    The claims asserted herein arise under and pursuant to Section 11 of the Securities Act of 1933 (15 U.S.C. §775), Securities Act Section 15 (15 U.S.C. § 77o), Sections 9(a)(2) of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78i(a)(2)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], Exchange Act Section 18(a) [15 U.S.C. § 78r(a)], Exchange Act Section 20(a) [15 U.S.C. § 78t(a)], Exchange Act Section 20A [15 U.S.C. § 78t-1(a)], (the "Exchange Act") and Rule 10b-

5 [17 C.F.R. § 240.10b-5].

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act.

25.     The venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because many of the acts and practices complained of herein occurred in substantial part in this District, and the shares of the JNUG & NUGT trade in this District on the New York Stock Exchange ("NYSE") Arca.

26.     The transactions, acts, practices, and courses of business constituting the violations herein occurred within the jurisdiction of the United States District Court for the Southern District of New York and elsewhere.

27.     In connection with the transactions, acts, practices, and courses of business alleged hereof, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.        PARTIES

28.     Plaintiff Lee Xu purchased shares of the JNUG, JDST, DUST, and NUGT pursuant to the information in Registration and Prospectus and was damaged thereby, as detailed in the Certification attached hereto as Exhibit 1.

29.     Defendant Direxion Shares ETF Trust is a Delaware statutory trust and a registered investment company with the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940, as amended ("1940 Act"), offering a variety of exchange-traded funds (ETFs), including JNUG & NUGT, as listed and traded on the NYSE Arca, Inc. The Trust was

organized on April 23, 2008. Direxion Shares ETF Trust and another company, Direxion Funds, were managed by Rafferty Asset Management, LLC, offering leveraged index funds, both bull and bear ETFs, and alternative fund products into markets. Direxion started at approximately $6.2 billion of managed assets as of October 31, 2009, to roughly $24.3 billion in assets as of March 31, 2021. As of the date of the SAI on 12/30/2020, offers for sale to the public 75 of the 79 funds registered with the SEC. Direxion has offices with Rafferty at 1301 Avenue of the Americas (6th Avenue), 28th Floor, New York, NY 10004, and a satellite office with Rafferty at 1010 Franklin Avenue, Suite 300A Garden City, NY 11530.

30.      Defendant Rafferty Asset Management LLC ("Rafferty"), as the investment advisor for the Funds, provides investment management and advisory services to the Direxion based on Investment Advisory Agreement ("Advisory Agreement"), Advisory Fee Waiver Agreement, and Operating Expense Limitation Agreement. Rafferty is responsible for developing, implementing, and supervising the Funds' investment program. Senior officers of Rafferty regularly report to the Direxion Board on a range of matters. Rafferty is also the sole owner of Direxion Advisors, LLC ("Direxion Advisors"), an investment adviser to certain series of Funds the Trust. Raffety was organized as a New York limited liability company in June 1997. Defendant O'Neill is the Managing Director of Rafferty. Michael Raffety and Kathleen Rafferty Hay control Rafferty through their ownership in the company, and Daniel D. O'Neil controls Rafferty through his ownership in Minakian Partners, LLC. Rafferty has offices at 1301 Avenue of the Americas (6th Avenue), 28th Floor, New York, NY 10004.

31.      Defendant Direxion Family of Investment Companies ("Direxion Family") consists of the Direxion Shares ETF Trust; the Direxion Funds, which, as of the date of same SAI, offers for sale to the public 14 funds registered with the SEC; and the Direxion Insurance Trust which,

does not have any funds registered with the SEC. The same persons who constitute the <u>Direxion Shares</u> board also constitute the board of trustees of the <u>Direxion Funds</u> and the <u>Direxion Insurance Trust</u>.

32.    Defendant Daniel D. O'Neill is the President and a Trustee of Direxion Shares ETF Trust and serves as Chairman of the Board of Trustees of the Direxion Funds, Direxion Insurance Trust, and Direxion Shares ETF Trust. Defendant O'Neill signed Form N-1A Registration Statements, Amendment No. 260, 262 on February 27, 2020, and later Amendments. Daniel D. O'Neil controls Rafferty through his ownership of Minakian Partners, LLC.

33.    Defendant Daniel J. Byrne is a Trustee of Direxion. Defendant Byrne signed Form N-1A Registration Statements, Amendment No. 260, 262, and Amendments.

34.    Defendant Gerald E. Shanley, III is a Trustee of Direxion. Defendant Shanley signed Form N-1A Registration Statements, Amendment No. 260, 262, and Amendments.

35.    Defendant Jacob C. Gaffey is a Trustee of Direxion. Defendant Gaffey signed Form N-1A Registration Statements, Amendment No. 260, 262, and Amendments.

36.    Defendant Patrick J. Rudnick is the Principal Executive Officer and Principal Financial Officer of the Direxion Shares ETF Trust; also Senior Vice President of Rafferty Asset Management, LLC. since March 2013. Defendant Rudnick signed Form N-1A Registration Statements, Amendment No. 260, 262, and Amendments.

37.    Defendant Messrs. Shanley, and Gaffey, are members of the Audit Committee, the Qualified Legal Compliance Committee, and the Nominating and Governance Committee.

38.    Defendants O'Neill, Kellerman, Byrne, Shanley, Gaffey, and Rudnick are sometimes referred to herein as the "Individual Controlling Defendants," who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing

language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance.

39.     Defendant Angela Brickl is the Chief Compliance Officer Secretary the Direxion Shares ETF Trust, also General Counsel of Rafferty Asset Management LLC since October 2010; Chief Compliance Officer of Rafferty Asset Management, LLC since September 2012; Chief Operating Officer of Rafferty Asset Management, LLC since April 2021.

40.     Defendant Todd Kellerman is the Treasurer and Controller of Direxion.

41.     Defendants Paul Brigandi and Tony Ng are jointly and primarily responsible for the day-to-day management of the Funds, bearing their primary responsibility and oversight in the day-to-day management of the Funds.

42.     Defendant Michael Raffety and Defendant Kathleen Rafferty Hay control Rafferty as shareholders.

43.     Defendant Brickl, Kellerman, Hay, and Michael Raffety are sometimes referred to herein as the "Individual Managerial Defendants" are high managerial agents or members of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance.

44.     Each of the "Individual Controlling Defendants" and "Individual Managerial Defendants":

a)  Directly participated in the management of the Company.
b)  was directly involved in the Company's day-to-day operations at the highest levels.
c)  was privy to confidential, proprietary information concerning the Company and its business and operations.
d)  was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein.
e)  was directly or indirectly involved in overseeing or implementing the Company's internal controls.
f)  was aware of or recklessly disregarded the fact that the false and misleading

statements were being issued concerning the Company; and/or

g) approved or ratified these statements in violation of federal securities laws.

45.    Defendant U.S. Bancorp Fund Services, LLC ("USBFS") serves as the Funds' administrator, providing reports as service providers to the Direxion. USBFS provides Direxion with administrative and management services (other than investment advisory services). Direxion pays USBFS a **fee based on Direxion's total average daily net assets**. USBFS also is entitled to certain out-of-pocket expenses. The fees are paid by the Direxion to USBFS pursuant to the Fund Administration Servicing Agreement for the fiscal years. USBFS has an office at 615 East Michigan Street, Milwaukee, Wisconsin, 53202.

46.    Defendant Foreside Fund Services, LLC ("Foreside"), serves as the distributor ("Distributor") in connection with the continuous offering of each Fund's shares. The Trust offers Shares of the Funds for sale through the Distributor in Creation Units. The Trustees have adopted a Rule 12b-1 Distribution Plan ("Rule 12b-1 Plan") that each Fund may pay a fee of up to **0.25% of the Fund's average daily net assets** for certain expenses incurred in the distribution and the servicing and maintenance of existing shareholder accounts. As the Funds' principal underwriter, the Distributor and Rafferty may have a direct or indirect financial interest in the Rule 12b-1 Plan or any related agreement. Foreside is located at 3 Canal Plaza, Suite 100, Portland, Maine 04101.

47.    Defendant Direxion Advisors, LLC ("Direxion Advisors") is an investment adviser to certain series of Funds. Direxion Advisors shares the same office with Direxion at 1301 Avenue of the Americas (6th Avenue), 28th Floor, New York, New York 10019.

48.    Defendants O'Neill, Michael Raffety, Kathleen Rafferty Hay, Brigandi, and Ng, sometimes referred to herein as "Portfolio Managers," are the high managerial agent of the Trust or management company or affiliates by agreements who designed the fraudulent scheme, ratified,

recklessly disregarded, or directly managed or committed the price control or market manipulation.

49.    Defendants "Direxion Advisors," "Foreside," "USBFS," "Direxion Family," and are sometimes referred to herein as "Affiliate Companies."

## SUBSTANTIVE ALLEGATIONS

### I.    THE FRAUDULENT AND MISREPRESENTATION IN SEC REGISTRATION AND FILINGS

50.    Rafferty claimed that "the Funds are using derivatives in a simplified manner in pursuit of a passive investment strategy and prominently disclosing their leveraged natures, both through a naming convention and risk disclosure." It seemed Direxion relied on two things: naming convention and risk warning to get around the critics of using too many derivatives.

51.    Direxion claimed that investors need "read nothing but the name of the Fund: that the Fund is an index fund that seeks leveraged returns on a daily basis." Funds' naming conventions are as follows:

*Direxion + Daily + Underlying Index + Bull (Bear) + 3X + Shares*

52.    However, all information in the naming convention is wrong.

53.    Simple risk warnings, cautionary language, and partial disclosure of Direxion cannot cure its false naming convention and misrepresentation.

54.    Defendants have breached the Securities Act by knowingly hiding necessary information and promoting the opposite information in the Registration and Prospectuses. Defendants misled the market and misrepresented the material facts intentionally, repeatedly, or at least with severe recklessness. All responsible defendants have known the facts and joined this

fraudulent disclosure and price manipulation. The defendants' behaviors were an extreme departure from the standards of ordinary care and violated almost all securities laws.

55.    In a letter to the SEC to lift the proposed derivative investment cap, Rafferty claimed,

> *In summary, investors in 3X ETFs receive extensive and direct disclosure regarding the Funds' strategies, use of derivatives, leverage, and related risks both from the Funds themselves and from their brokerage firm as well. As a result, they understand the products, and their understanding of the products is evidenced by their active trading of them, which is reflected in the short, implied holding periods of their shares.*

56.    How could Rafferty say its investors were well-informed by its misleading and partial disclosure? What statistics had been applied to show such knowledge? How much false information have defendants provided to keep public listing without any derivative holding cap?

**A.    <u>Hide Long-Term Down Trend Feature</u>**

71.    The Funds are perfect long-term shorting investment vehicles with a rapid compounding down trait, which is irrelevant to the benchmark's trend.

72.    Direxion claimed the Funds were not suitable for long-term trading, meanwhile trying to depict pictures of possible high long-term investment return in the same filing, trying to hide the trait from the public and induce them to long the Funds in the SEC filings.

**a)  Cheating Languages**

73.    The NUGT Summary Prospectus on February 28, 2020, stated,

> *"(T)his means that the return of the Fund for a period longer than a trading day will be the result of each trading day's compounded return over the period, which will very likely differ from 300% of the return of the Index for that period. As a consequence, **<u>a long holding period, higher volatility of the Index and greater leverage increase the impact of compounding on an investor's returns</u>**. During periods of higher Index volatility, **<u>the volatility of the Index may affect the Funds' return as much as, or more than, the return of the Index</u>**.*

74.    It stated that higher volatility and greater leverage of NUGT give a more significant

impact on return for a greater holding period, and the Fund returns would be as much as, or more than, the leveraged return of the Index, which could be either greater up or greater down. The statement indicated  that investing for more than one day is a plausible strategy.

75.    The higher risky return is precisely what some investors are seeking.

76.    The NUGT Summary Prospectus contained similar language in the first Paragraph to give hope to investors on February 28, 2021, after switching the Funds from 3x to 2x leverage. It claimed that the Fund's long-term return might be as much as or more than 2X leveraged return because it can differ from 200% of the return of the Index, either up or down, during periods of higher index volatility.

> *"The return of the Fund for a period longer than a trading day will be the result of each trading day's __compounded return over the period, which will very likely__ __differ from 200% of the return__ of the Index for that period. __Longer holding periods, higher volatility__ of the Index, and leverage __increase the impact of compounding on an investor's returns__. During periods of higher Index volatility, the volatility of the Index may affect the Fund's return as much as, or more than, the return of the Index."*

77.    Almost all Prospectuses and NUGT Summary Prospectuses before 2020 repeated significantly similar language in the "Important Information Regarding the Fund."

78.    Those languages indicated that the volatility would differ and primarily will enlarge the return, either up or down; thus, investing for longer periods is a perfectly plausible strategy if the Index goes in a favorable direction.

79.    The term "differ" misled the public to a more significant investment return than 2x leverage. The statements did not disclose that the Fund's loss rate is significantly larger than the winning rate in the long run and irrelevant to the underlying index trends.

80.    Although it claimed the Funds did not fit for long-term investment, the same 02/28/2020 NUGT Prospectus explained,

> *"In light of the financing charges and each Bull Fund's operating expenses, the*

*expected return of a Bull Fund* **over one trading day is equal to the gross expected return, which is the daily underlying index return multiplied** *by a Bull Fund's* **daily leveraged investment objective, minus (i) financing charges incurred by the portfolio and (ii) daily operating expenses***."*

81.     This language denied compounding and misled the investors that any longer-term return would be the gross expected return times leverage after the expenses.

82.     A statement is "material" when "a substantial likelihood that the reasonable investor would have viewed the disclosure of the omitted fact as having significantly altered the total mix of information available." If investors know that the downside rate is hugely more significant than the upside, they will not elect to buy long the Funds or will not invest them.

**b)  Hiding Overall Performance**

83.     Using "total return" to mix the "overall returns" in the 2020 NUGT Summary Prospectus, defendants publicized that its NUGT return is -48.17% in 2011, -43.48% in 2012, -95.01% in 2013, -59.53% in 2014, -78.09% in 2015, 57.84% in 2016, 3.25% in 2017, -44.79% in 2018, 100.89% in 2019, and -60.10% in 2020, as follows,



Total Return for the Calendar Years Ended December 31

84.     The example showed that gold had similar trends; NUGT went up and down.

85.     The Prospectus failed to disclose that a -43.48% decline needs a 77% return to get even, a -95% decline needs s 1900% return to get even; consecutive 3-year positive returns of 78%, 57.84%, and 3.25% were far away from recovering initial investments; a -44.79% decline needs 81% return to even; a -60.10% return needs 150% in return to even. The fact is: NUGT has

been rushing down the road and has never been back to its original price since it embarked market.

86.    Defendants further failed to disclose that the 10-year "Overall Investment Return" is as follows:

51.83% * 56.52% * 5.99% * 40.47% * 21.91% * 157.84% * 103.25% * 55.21% * 200.89% * 39.90% = 0.1122%, or 0.001122 of original value, a 99.89% loss in 10 years.

*As to Google Finance, NUGT has downed 99.92%, leaving only 0.08%, or 0.0008 of the original value, as of 06/24/2021.*

87.    The 05/28/2021 NUGT "Fact Sheet" stating that NUGT's 10-year return was -51.08%; 5-year return was -25.11%; 3-year return was -23.31%; 1-year return was 65.43%; 3-month return was -21.43%; 1-month return was 8.03%, as of 03/31/2021. However, they are "Average Annual Returns."

**Performance** (As of 03/31/2021)

| | | 1M % | 3M % | YTD % | 1Y % | 3Y % | 5Y % | 10Y % | S/I of the fund % | Inception Date |
|---|---|---|---|---|---|---|---|---|---|---|
| NUGT | NAV | 8.03 | -21.43 | -21.43 | 65.43 | -23.31 | -25.11 | -51.08 | -50.43 | 12/08/10 |
| | Market Close | 8.36 | -21.38 | -21.38 | 60.47 | -23.30 | -25.10 | -51.08 | -50.39 | |
| DUST | NAV | -10.15 | 12.17 | 12.17 | -70.64 | -67.12 | -64.47 | -50.04 | -49.00 | 12/08/10 |
| | Market Close | -10.07 | 12.21 | 12.21 | -70.33 | -67.12 | -64.46 | -50.04 | -49.02 | |
| GDMNTR | | 3.48 | -10.04 | -10.04 | 39.10 | 14.84 | 11.11 | -4.99 | -5.09 | |

88.    By putting "Performance" instead of "Average Annual Returns" in the title of the table, the Prospectus tried to mix the "Average Annual Return" with "Overall Return."

89.    To further mislead investors that the long-term leveraged investing goal was still possible and very likely to achieve, Direxion put in the 2021 NUGT Summary Prospectus as follows,

*"(t)he Fund's highest calendar quarter return was 140.48% for the quarter ended March 31, 2016, and its lowest calendar quarter return was -80.05% for the quarter ended March 31, 2020"*

90.    Some investors were inspired by the wrongful statement and wished to buy the deep

bottom after a thousand times loss and after the gold industry had bottomed up. However, the Funds can never go up to their original value, or very hard to back to an earlier price level.

91.     "[W]hen a company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information was not. The company then must correct the prior statement within a reasonable time." Stransky v. Cummins Engine Co., Inc., 51 F.3d 1329, 1331 (7th Cir. 1995). Defendants have the duty to disclose the overall performance of the Funds after significant loss to the Funds value.

92.     "[A] reasonable investor may depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion--or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." Omnicare, 135 S. Ct. at 1328.

93.     "[E]ven a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation." See Kleinman v. Elan Corp., 706 F.3d 145 (2d Cir. 2013) (citation omitted).

94.     NUGT's Summary Prospectus of 02/28/2021 used another term: "Average Annual Total Returns," still trying to mix "overall return" by using "total return."

**Average Annual Total Returns** (for the periods ended December 31, 2020)

| | 1 Year | 5 Years | 10 Years |
|---|---|---|---|
| Return Before Taxes | -60.10% | -6.33% | -50.21% |
| Return After Taxes on Distributions | -60.10% | -6.38% | -50.32% |
| Return After Taxes on Distributions and Sale of Fund Shares | -35.58% | -4.65% | -13.20% |
| **NYSE ARCA Gold Miners Index** (reflects no deduction for fees, expenses or taxes) | 23.69% | 22.42% | -4.17% |
| **S&P 500® Index** (reflects no deduction for fees, expenses or taxes) | 18.40% | 15.22% | 13.88% |

95.   The actual return compared to the S&P 500 is as follows by Charles Schwab,



- *NUGT, S&P, and Trading-Leveraged Equity all started at $10,000.00 in original value in 2011.*
- *The topper line represents S&P 500 going right top to close to $40,000.00 in 2021, and the lower blue line represents the NUGT going directly to the right bottom to almost $0.00 to 04/30/2021.*
- *Please noticing the **<u>averaged annual return numbers are different</u>** from NUGT's Summary Prospectus numbers in 2021:*
  - *The 1-month annualized return was +10.9%, 3-month return was -3.7%, 6-month return was -21.3%, 1-year annualized return was -3.3%, 3-year annualized return was -33.6%, the total annualized return since inception was -49.4%.*

96.   The overall NUGT10-year return is -99.91%, as follows,



| NUGT | |
|---|---|
| Start date: | 12/13/2010 |
| End date: | 05/14/2021 |
| Start price/share: | $79,240.00 |
| End price/share: | $73.08 |
| Starting shares: | 0.13 |
| Ending shares: | 0.13 |
| Dividends reinvested/share: | $1.59 |
| Total return: | -99.91% |
| Average Annual Total Return: | -48.80% |
| Starting investment: | $10,000.00 |
| Ending investment: | $9.33 |
| Years: | 10.42 |

Growth of $10,000.00
With Dividends Reinvested

TickerTech.com May 15, 2021

97.     A duty may arise when there is a corporate insider trading on confidential information, or a corporate statement that would otherwise be "inaccurate, incomplete, or misleading," *Stratte-McClure v. Morgan Stanley*, 776 F.3d at 101 (2d Cir. 2015) (quoting *Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992)(quoting *Backman v. Polaroid Corp.*, 910 F.2d 10, 12 (1st Cir. 1990) (en banc)); accord *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000).)

98.     Direxion has never disclosed long-term five-year or ten-year overall returns, which must reveal since the long-term losses are tremendous.

99.     Leveraged ETFs provide a safe impression that the investor will not be forced to clear all positions as other leveraged trading tools, like futures or forex. It is thus desirable, especially with a promised leveraged return. However, futures and forex can go up in the long run, but the Funds will only go down in one way in the long term.

100.     Hiding the down trait, cloaking under leveraged ETF, promising in the Registration and Prospectus, and trading publicly, NUGT successfully cheated investors and have never lacked future investors.

101.     *In the Matter of Fiduciary Asset Management LLC,* Investment Company Act Release No. 30309 (December 19, 2012), a similar closed-end investment company, the

Commission found that the registration statement "made no mention of the downside risks the Fund could face by trading index put options and variance swaps, including leveraged exposure to market declines or exposure to spikes in market volatility."

102.    In *In the Matter of Claymore Advisors, LLC,* Investment Company Act Release No. 30308 (December 19, 2012), a closed-end investment company, the Commission found that there was "no mention of the downside risks the Fund could face by trading index put options and variance swaps, including the Fund's leveraged exposure to market declines and spikes in market volatility"

103.    Investors who invested and traded the Funds relied on Direxion's SEC public information on the well-developed market. Investors also relied on the integrity of the market price when deciding whether to buy or sell the Funds. Thus, reliance can be rebuttably presumed. *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

104.    With the NUGT having declined 1,250 times in its 12-year operation, the Trust, its management group, all responsible personnel, and defendants should have known the Funds will always go lower at a breakneck speed, no matter how the underlying Index performed.

105.    Since the Funds have a predictable and promised long-term downside trend, the Funds are perfect long-term shorting investment vehicles. The statements that the Funds are not suitable for long-term investment are thus wrong.

106.    This is necessary information for investors to make an investment decision.

107.    Defendants knowingly and intentionally hid the necessary information from the general public and thus its misrepresentation.

108.    Direxion has submitted dozens of Summary Prospectus and statutory Prospectuses, but none revealed this information.

109.   It is thus fraudulent.

110.   Knowing of the inside information of sure downtrend, all defendants are hard to say they have never sought shorting profit of the Funds, by themselves or by affiliated third parties.

111.   Direxion holds positions in futures, and miners' stocks, hedging the investors in its ETFs. As those positions in the gold industry keep going up, Direxion has never shared its income in the investment portfolios but let the investors pay the pricing down.

**B.   Hide Real Compounding Effects**

112.   As a haven investment, the gold industry has recovered from a historical low, and benchmarked index will inevitably price up. That's the reason investors invest in the Funds.

113.   In its 02/28/2020 Prospectus, Direxion gave an example of the "Impact of Daily Compounding."

The same $100 investment in Fund B, however, would be expected to gain in value on Day 1 but decline in value on Day 2. The $100 investment in Fund B would be expected to gain 10% on Day 1 (200% of 5%) but decline 9.52% on Day 2.

| Day | Index Performance | 200% of Index Performance | Value of Investment |
|-----|-------------------|---------------------------|---------------------|
|     |                   |                           | $100.00             |
| 1   | 5.00%             | 10.0%                     | $110.00             |
| 2   | -4.76%            | -9.52%                    | $99.52              |

114.   The Table is a partial example of compounding. It intentionally chose inequal up and down numbers. It intentionally chose a rate not back to its original value. It did not explain how much needed to return to the initial value in a leveraged price move. After leverage, the volatility times compounding is why their prices will deviate from the underlying indexes in a long-term trend. It is critical and material to inform the investors of both sides of compounding and leveraged results.

115.   The magic of compounding is that compounding down is much quicker than up and always needs a tremendous up rate to return to the original value. We adjust the Table as follows,

| Day | Index | Value | Index | Value | Index | Value | Index | Value |
|-----|-------|-------|-------|-------|-------|-------|-------|-------|
|  |  | 100 |  | $100 |  | $100 |  | $100 |
| 1 | 5% | 105 | 10% | $110 | 20% | $120 | 40% | $140 |
| 2 | -5% | 99.75 | -10% | $99 | -20% | $96 | -40% | $84 |

*If 1ˢᵗ day is up 5%, 2ⁿᵈ day loses 5%, and the Fund loses only 0.025%;*
*If 1ˢᵗ day is up 10%, 2ⁿᵈ day loses 10%, and the Fund loses only 1%;*
*If 1ˢᵗ day is up 20%, 2ⁿᵈ day loses 20%, and the Fund loses only 4%;*
*If 1ˢᵗ day is up 40%, 2ⁿᵈ day loses 40%, and the Fund loses only 16%;*
*The loss enlarges to 16% in the same 40% up and down price swing, and*
*it is the reason that Funds are deviating from the underlying index.*

116. The bigger the price swing, the bigger the Funds trend will deviate from the underlying index trend. If the price downs 50%, then a 100% up is needed to get even. When Direxion boasts an increase of less than 100%, the Funds have not yet recovered from a prior 50% loss.

| Day | Index | Value | 200% | Value |
|-----|-------|-------|------|-------|
|  |  | $100 |  | $100 |
| 1 | -25% | $75 | -50% | $50 |
| 2 | 33.33% | 100 | 100% | 100 |

117. Further, <u>10% down ($90.00) needs almost 11.1% up to make even (90*1.11=$99.99); 20% down need 25% up to make even (80*1.25=100); 30% down needs almost 43% up to make even (70*1.43=100.1); 40% down needs almost 66.67% up to make even (60*1.67=100.2).</u>

118. In contrast, a 10% up needs only -9.1% down to even (110*0.909=99.99); a 20% up needs only -16.67% down to even (120*0.833=96.96); a 30% up needs only -23.1% to even (130*0.769=99.97); a 40% up needs only -28.6% to even (140*0.714=99.96).

119. Compounding further means that the more significant the loss, the harder it is to return to even—the more significant the volatility, the bigger the loss, and the harder to go even.

A loss of less than 10% is relatively safe, an upset over 10% becomes dangerous, and a loss over 50% needs a 100% rise or doubling price to recover.

120.  The compounding applies to every stock or equity. But most equities seldom fluctuate more than 10% in a brief period, and most equities are based on real value. However, these Funds are derivatives out of derivatives, meaning that they are games of numbers; they are extremely dangerous, adding leverage and swinging 5% to 30% almost every day. Thus, compounding becomes a colossal problem to leveraged Funds that all significant losses compounded together will only send the Funds to the downside and no way back.

121.  The Prospectus table is relaying a half-truth. Direxion has a duty of saying nothing or telling the whole truth. Direxion probably does not have to teach investors math, but it must disclose the entire compounding result if it elects to disclose.

122.  This disclosure is essential for investors to realize the natural compounding effect since most investors and the market cannot know the Funds compounding risks from this partial information.

123.  If circumstances exist where the seller is particularly aware of an infirmity in the subject matter and the purchaser is not, the duty arises for the seller to disclose the material facts likely to affect the judgment of the purchaser in his decision on whether or not to complete the sale. The rule of caveat emptor does not apply where it was the vendor's duty to acquaint the vendee with the material fact known to the vendor but unknown to the vendees.

### C. Failed to Disclose Operating Cost Compounding Effects

124.  Direxion's operating cost also decreases the compounding because it is pretty high. For example, if the operating cost is 1.14% per day, the two-day 98.86% compounding makes

2.5% price down, the three-day 98.86% compound makes 3.5% price down, and the four-day

compounding makes 5% price down. By the costs of the Funds themselves, the price will always

trend down, with no joining of other elements.

125.  Direxion has never disclosed the Funds' overall daily costs compounding effects

and daily cost and expenses data.

126.  All we can find is as follows: Rafferty earns investment management fees; USBFS

earns its compensation on Trust's total average daily net assets; BNYM earns its accounting fee;

Foreside earns its fee up to 0.25% of the Fund's average daily net assets. The margin cost and other

management and investment costs and expenses may add up to a high rate of its daily net assets.

**D. Direxion's Prospectus Compounding and Volatility table was partial and misleading**

127.  In its "Principal Investment Risks" of the "Effects of Compounding and Market

Volatility Risk" in 02/28/2021 NUGT Summary Prospectus, Direxion provided a one-year

*Volatility Rate table* showing compounding results as follows,

| One Year Index Return | 200% One Year Index Return | Volatility Rate | | | | |
|---|---|---|---|---|---|---|
| | | 10% | 25% | 50% | 75% | 100% |
| -60% | -120% | -84.2% | -85.0% | -87.5% | -90.9% | -94.1% |
| -50% | -100% | -75.2% | -76.5% | -80.5% | -85.8% | -90.8% |
| -40% | -80% | -64.4% | -66.2% | -72.0% | -79.5% | -86.8% |
| -30% | -60% | -51.5% | -54.0% | -61.8% | -72.1% | -82.0% |
| -20% | -40% | -36.6% | -39.9% | -50.2% | -63.5% | -76.5% |
| -10% | -20% | -19.8% | -23.9% | -36.9% | -53.8% | -70.2% |
| 0% | 0% | -1.0% | -6.1% | -22.1% | -43.0% | -63.2% |
| 10% | 20% | 19.8% | 13.7% | -5.8% | -31.1% | -55.5% |
| 20% | 40% | 42.6% | 35.3% | 12.1% | -18.0% | -47.0% |
| 30% | 60% | 67.3% | 58.8% | 31.6% | -3.7% | -37.8% |
| 40% | 80% | 94.0% | 84.1% | 52.6% | 11.7% | -27.9% |
| 50% | 100% | 122.8% | 111.4% | 75.2% | 28.2% | -17.2% |
| 60% | 120% | 153.5% | 140.5% | 99.4% | 45.9% | -5.8% |

128.  Given the constant volatility change every mini-second, and anytime, the average

rate in this static Table cannot explain dynamic compounding movement.

129.  Uneven index movement can tear down the trend much bigger than evenly milder index movement in the same period. We explain the difference in the following Table, presuming that the one-year index return is -30%.

| Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Average volatility rate |
|-----|-----|-----|-----|-----|------|------|-----|------|-----|-----|-----|-------------------------|
| 100% | 100% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 25% |
| 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% | 25% |

*The Table shows two different groups of 2X index movement rates; then, we find relative price numbers in the Volatility Rate table as follows,*

| Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec | Overall Value |
|-----|-----|-----|-----|-----|------|------|-----|------|-----|-----|-----|---------------|
| -82% | -82% | 51.5% | -51.5% | -51.5% | -51.5% | -51.5% | -51.5% | -51.5% | -51.5% | -51.5% | -51.5% | 0.0000233 |
| -54.0% | -54.0% | 54.0% | -54.0% | -54.0% | -54.0% | -54.0% | -54.0% | -54.0% | -54.0% | -54.0% | -54.0% | 0.0004241 |

- *The first example leaves the overall residue value as 0.0000233 or 0.00233%*
- *The second example: leaves the overall residue value as 0.0004241 or 0.04241%, almost 20 times higher.*

130.  Both examples have 25% average volatility, but the compounding results are 20 times different because of different volatility inside the period.

131.  Because the volatility changes forever, we cannot explain the actual price moves by merely average volatility only. Direxion's static Table hides the severe compounding effect of leveraged volatility.

132.  The Table picked whatever defendants intended to tell, hiding the critical truth. This Table is partial and misleading to make investors feel safe from the dangerous leveraged compounding and volatility.

133.  Direxion cannot use general and easy disclaimers to deny its duty to a more straightforward interpretation. We take a look at the famous Volatility Table again,

| One Year Index Return | 200% One Year Index Return | Volatility Rate | | | | |
|---|---|---|---|---|---|---|
| | | 10% | 25% | 50% | 75% | 100% |
| -60% | -120% | -84.2% | -85.0% | -87.5% | -90.9% | -94.1% |
| -50% | -100% | -75.2% | -76.5% | -80.5% | -85.8% | -90.8% |
| -40% | -80% | -64.4% | -66.2% | -72.0% | -79.5% | -86.8% |
| -30% | -60% | -51.5% | -54.0% | -61.8% | -72.1% | -82.0% |
| -20% | -40% | -36.6% | -39.9% | -50.2% | -63.5% | -76.5% |
| -10% | -20% | -19.8% | -23.9% | -36.9% | -53.8% | -70.2% |
| 0% | 0% | -1.0% | -6.1% | -22.1% | -43.0% | -63.2% |
| 10% | 20% | 19.8% | 13.7% | -5.8% | -31.1% | -55.5% |
| 20% | 40% | 42.6% | 35.3% | 12.1% | -18.0% | -47.0% |
| 30% | 60% | 67.3% | 58.8% | 31.6% | -3.7% | -37.8% |
| 40% | 80% | 94.0% | 84.1% | 52.6% | 11.7% | -27.9% |
| 50% | 100% | 122.8% | 111.4% | 75.2% | 28.2% | -17.2% |
| 60% | 120% | 153.5% | 140.5% | 99.4% | 45.9% | -5.8% |

134.  On 02/28/2021, NUGT Summary Prospectus,

"The Index's annualized historical volatility rate for the five years ended December 31, 2020, was 33.34%. The index's highest volatility rate for any one calendar year during the five years was 45.63%, and volatility for a shorter period may have been substantially higher. The index's annualized performance for the one year ended December 31, 2020, was 22.42%."

135.  Volatility between "10% and 50%" is in a relatively safe range in the Table, and the 10% to 25% volatility range is even better; both bring some opportunities to receive a positive return. Thus 5-year annualized 33.34% volatility and 2020's 22.42% volatility would get -5.8% to 35.3% return as in the Table; however, the Fund's 2020 performance is -60.10%, the 5-year annualized return was -51.08%.

136.  To further ease the investors to long the Funds, in the 02/28/2021 NUGT Summary Prospectus, Direxion explained that the other underlying indexes are all ideally located in this safe range, as follows,

#### Table 2  –  Historic Volatility of each Fund's Benchmark Index

| Index | 5-Year Historical Volatility Rate |
|---|---|
| Energy Select Sector Index | 21,51% |
| MSCI Brazil 25/50 Index | 30.41% |
| MVIS Global Junior Gold Miners Index | 34.60% |
| MVIS Russia Index | 22,28% |
| NYSE Arca Gold Miners Index | 32,13% |
| S&P Oil & Gas Exploration & Production Select Industry Index | 35.60% |

137.  Table 2 shows the annualized volatility for underlying indexes over the five years ended December 31, 2019. The historical volatility rates between 21.51 % to 35.60% could potentially bring -5.8% to 35.3% return, as in the Table.

138.  By this Volatility Table and average volatility figures, Direxion combinedly misrepresented to the general public that it could provide a long-term longing strategy since the volatility offers many opportunities for pricing up. The compounding will send the price to differ or higher than leveraged target when the underlying index favors the trend and the volatilities are in the safe range.

139.  However, the Funds have seldom gone up in actual trading, although the annualized volatility rates have always been in a safe zone, and underlying indexes keep going up.

140.  Direxion partially disclosed material and critical facts that affect investors' judgment, while all responsible defendants are aware of the infirmity. Filled with wrongful and partial information, public investors have been trapped by these dangerous leveraged Funds schemes. If the investors know the whole story, no investors will buy long the Funds. It's maintainable for a charge of fraud relating to this partial disclosure.

**C.    Direxion's Naming Convention was Wrong**

**(a)        Direxion Misrepresented the Funds are "Daily."**

141.  Direxion defined the terms "daily," "day," and "trading day," which refer to the period "from the close of the markets on one trading day to the close of the markets on the next trading day." Hence the daily leveraged investment result shall be understood as a period result other than pinpointed closing time result.

142.  Direxion claimed that its Funds were only appropriate and "seeks daily leveraged investment result."

143.  Significantly, the funds are not appropriate for day trades at all: Funds do not and cannot be leveraged in the period range of a trading day other than the <u>pinpointed closing time!</u>

144.  Direxion represented that it rebalances and readjusts all positions only at the pinpointed closing time.

145.  Thus, the magic "daily" name is wrong for the Funds, as they are not daily leveraged but closing time leveraged!

146.  Because Direxion and all responsible defendants rely on the name to explain to the SEC and public for the derivative use, they have been facially and fundamentally misrepresented.

**(b)    <u>Direxion Misrepresented Intraday Prices as Leveraged but not, and Impossible.</u>**

147.  Other than trying to readjust to 2x or 3x leveraged price to underlying indexes at closing time, the Funds do not and impossibly seek leveraged index change in additional daily trading hours.

148.  As volatility within a trading day will always fluctuate mini-secondly and at any time, the volatility compounding will send the leveraged price far away from the underlying index, mainly to the downside, just like long-term trading.

149.  The Prospectus claimed in its second Paragraph of Direxion Shares ETF Trust Prospectus dated February 28, 2021,

*"**The <u>Funds seek daily leveraged investment results</u> and are <u>intended to be used as short-term trading vehicles</u>.** The Funds with "Bull" in their names attempt to provide daily investment results that correspond to two times the performance of an underlying index and are collectively referred to as the "Bull Funds." Each Fund with "Bear" in its name attempts to provide daily investment results that correspond to two times the inverse (or opposite) of the performance of an underlying index and are collectively referred to as the "Bear Funds."*

The 03/20/2020 Prospectus depicted the Funds as daily trading tools as follows,

*The **Bull Funds seek daily leveraged investment results**, before fees and expenses, of 200% of the daily performance of an underlying index. The **Bear Funds seek daily inverse leveraged investment results**, before fees and expenses, of 200% of the daily inverse performance of an underlying index.*

The NUGT 497 Prospectus filed on March 27, 2020, set the "Investment Objective, Investment Strategy and Name Changes (from 3x to 2x)" again as follows,

*Effective after market close on March 31, 2020, each Fund's new investment objective and strategy will be to seek daily leveraged, or daily inverse leveraged, investment results, before fees and expenses, of 200% or -200%, as applicable, of the performance of its underlying index as noted in the Table below.*

150.  The Summary Prospectus further generally warned,

*"Investors in the Funds should: understand the consequences of seeking daily leveraged investment results;."*

151.  In NUGT 497 Prospectus filed on March 20, 2020, Direxion explained that return over a whole trading day is leveraged for both bull and bears Fund, after costs and expenses, as follows,

***The Projected Return of a Bull Fund for a Single Trading Day**. Each Bull Fund seeks to provide a daily return that is 200% of the daily return of an underlying index. ……the expected return of a Bull Fund over one trading day is equal to the gross expected return, which is the daily underlying index return multiplied by a Bull Fund's daily leveraged investment objective, minus (i) financing charges incurred by the portfolio and (ii) daily operating expenses. …..Each Bull Fund will reposition its portfolio at the end of every trading day.*

***The Projected Return of a Bear Fund for a Single Trading Day**. Each Bear Fund seeks to provide a daily return that is 200% of the inverse (or opposite) of the daily return of an underlying index. …..*
*As the holder of a short position, a Bear Fund also is responsible for paying the dividends and interest accruing on the short position….*

152.  The daily leveraged investment results cannot pinpoint closing time only for daily trading or short-term trading, especially since Direxion set the ETFs as "short-term trading vehicles" and "seek daily leveraged investment results."

153.  Although the defendants know of the impossibility of intraday price leverage, they

still named the Funds "Daily" and repeated the daily investment promotion for years. It cogently

goes beyond "severe recklessness." No other excuses can lead to any opposing inference of

nonfraudulent intent. The statements deceived and defrauded tens of thousands of investors,

including institutions. The scienter can be presumed.

154. In NUGT's Summary Prospectus dated February 28, 2021, repeated as follows,

*The Direxion Daily Gold Miners Index Bull2XShares (formerly, the Direxion Daily Gold Miners Index Bull 3X Shares) (the "Fund") <u>seeks daily leveraged investment results</u>.*

155.    Although temporary or slight deviation from the leveraged price will

generally be tolerated and accepted, hiding the fact that the intraday cannot be leveraged is

unacceptable.

156. In NUGT 02/28/2020 Summary Prospectus, Direxion put the language as follows,

*"The return for investors that invest for periods less than a trading day <u>will not be 300%</u> of the index's performance for the trading day."*

157. The 02/28/2021 NUGT Summary Prospectus tried to explain as follows,

*The return for investors that invest for periods **<u>longer or shorter</u>** than a trading day should <u>not be expected to be 200%</u> of the index's performance.*

158. It is still vague as to the term "cannot be expected," especially with contradictory

language in the same document. This statement was still partially made, hiding that the intraday

price is not just slightly different but fundamentally impossible to leverage the intraday prices.

159. From "differ," "will not," to "should not be expected to," Direxion tried to show

that the price may understandably deviate from the leveraged price slightly, temporarily, or may

not be precisely since it called the fund "daily leveraged." <u>They did not warn the public that the</u>

<u>price did not follow both the benchmarked index and leveraged return</u>; most importantly, it has

<u>never explained the intraday volatility and leverage also compound the price.</u>

160. The intraday price cannot be 3X leveraged or 2X leveraged and cannot be leveraged

at all because the mini-second price volatility and compounding can send the price to the moon.

161.  Until the Amendment to Registration Statement under the Securities Act of 1933 Form N-1A (485APOS Prospectus materials) filing on December 30, 2020, Direxion tried to adjust its statements that,

> the return for investors that invest for periods less than a full trading day **will not be the product of the return of a Fund's stated daily leveraged investment objective** and the performance of the underlying index **for the entire trading day.**

162.  Other than saying the whole trading day return will not be leveraged, it said that trading day return could not be a daily leveraged investment objective. Of course, the intraday price could not be the final daily price objective.

163.  Other than saying the entire trading day return will not follow the underlying index, it said that the trading day return could not be the index's performance for the whole of the day. Of course, the intraday price could not be the final daily price objective. Again, Direxion cheated the public and evaded its liabilities by using easy cheap disclaimers or warnings.

164.  From the first registration document to boast passive management and strict multiple or inverse multiple index investment objective to this sneaky unveiling, it took many years. Its misrepresentation in its prior filings has misled thousands or millions of investors.

165.  Who is supposed to reimburse the public investors for the loss?

166.  If not leveraged, how the intraday prices were maintained?

**(c)**    **The Contradiction of Intra-Day Trading and Closing Readjustment**

167.  In NUGT 497 Prospectus filed on March 20, 2020, Direxion provided Example 3 to explain "Intra-day Investment with volatility":

> The examples above assumed that Mary purchased the hypothetical Bull Fund at the close of trading on Day 1 and sold her investment at the close of trading on a subsequent day. However, _if she made an investment intra-day, she would have received a beta determined by the_ _performance of the underlying index_ from the end of the prior trading day until her time of

*purchase on the next trading day. Consider the following example.*

*Mary invests $10.00 in a hypothetical Bull Fund at 11 a.m. on Day 2. From the close of trading on Day 1 until 11 a.m. on Day 2, the underlying index moved from 100 to 102, a 2% gain. In light of that gain, the Fund beta at the point at which Mary invests is 196%.* ***During the remainder of Day 2****, the Fund's underlying index rises from 102 to 110**, a gain of 7.84%, and Mary's investment rise 15.4%* (***which is the underlying index gain of 7.84% multiplied by the 196% beta that she received***) *to $11.54. Mary continues to hold her investment through the close of trading on Day 3, during which the Fund's underlying index declines from 110 to 90, a loss of 18.18%. Mary's investment declined by 36.4%, from $11.54 to $7.34. For the period of Mary's investment, the Fund's underlying index fell from 102 to 90, a loss of 11.76%, while Mary's investment decreased from $10.00 to $7.34, a 27% loss.* Th*e volatility of the underlying index affected the correlation between the underlying index's return for the period and Mary's return. In this situation, Mary lost more than two times the underlying index's return.* Mary *was also hurt because she missed the first 2% move of the underlying index and had a beta of 196% for the remainder of Day 2.*

168.  The example promoted that the intraday price will be strictly bound by inter-day beta, which is determined by the index performance. Direxion did not explain that the intra-day price's leveraged volatility compounded.

169.  This example promised that the intra-day prices are leveraged at any point in time: during the remainder of Day 2, Mary's investment rises 15.4% as two times leveraged price after beta, which is 196%.

170.  As a result of compounding and volatility, the price will inevitably trend down mini-secondly and make the closing price readjustment impossible, which means that from any point in time, the latter prices will be compounded to deviate from the leveraged target and underlying index.

171.  Therefore, the Prospectus example is misleading, as all defendants know the fact in actual operations but never disclosed it.

172.  The Funds may be like balls kicked anywhere by anyone, on a daily level, and mainly intraday price will be like long-term trading continually trading down, or at least deviating hugely from the benchmark index trend.

173.  It further raised questions: who decides the intraday prices and how to determine the intraday prices? How to track the underlying index? How do defendants rebalance and readjust the closing price to meet the leveraged return at closing time?

### (d)    Intra-Day Price Control and Manipulation

174.  As the intraday leverage and volatility compound the price, Direxion has two choices: giving up leverage to be traded by the market freely or being leveraged but compounding.

175.  In either situation, the Funds will deviate from the underlying bench market, and there might be a big price gap at the closing time. But we seldom found this happening. In contrast, intra-day trading did follow the underlying index trend curve, and the closing price was smoothly readjusted.

176.  This means Direxion chose an illegal way: controlling the intra-day price, making the trend mimic the underlying index, and secretly manipulating the price towards the final closing readjustment.

177.  There is no other choice as the market could not meet the readjustment price precisely every day, especially impossible after leverage and compounding.

### (e)    Closing Price Readjustment Trap and Swing Trade

178.  To collect the ball at closing and make the game seem more serious, defendants must control the Funds' price to make them like tracking the index trading curves, at least on a daily level.

179.  Defendants must make the gap-filling smoother to the adjusted closing prices. But they have never disclosed how they fill the price gap.

180.  No matter where the balls go, defendants must collect the ball at closing time.

181.  Defendants know where to collect the balls and where the targets are.

182. The gap between the intraday price and readjusted closing price leaves huge profit space.

183. The gap opens the door for intraday price manipulation and the daily closing price gap swing trade.

184. These intraday price control can only be done artificially and manually. They throw a ball without leverage but call it daily leveraged balls; that is fraudulent; they control the price with personal will and price targets; that's price manipulation.

**(f)** **Conclusion**

185. Even with sophisticated research and profound study of the benchmarked indexes, traders can lose their money in the day-trading, no matter institutions or individuals, because the Funds do not seek the intraday leverage targets that all investors have never known.

186. Defendants have never disclosed that they decide the intraday prices. Defendants have never disclosed how they control the price to track the leveraged index and how they readjust the closing price, from what time they start to readjust the closing price, and what is their intraday price adjustment mechanism.

187. Defendants knew from the start that the intraday prices could not follow the underlying index leveraged price. They systematically control an intraday price daily but intentionally hide them from the general public.

188. What defendants claimed that the funds seek daily leveraged investment results is not the truth.

189. The Prospectus and disclosures were misrepresentations, misleading, and fraudulent.

**D.** **The Bull and Bear Pair Funds Trap**

190.  Direxion Shares provide market pair ETFs as a long investment tool because the Funds have both bull and bear funds. Instead of longing or shorting the underlying indexes, investors can elect to buy long the corresponding bull or bear ETFs.

191. Both bull and bear funds will be inevitably leveraged down because of compounding.

192.  By providing pairs of bull and bear leveraged investment tools to the market and hiding the compounding down feature of both pairs of funds, defendants can easily trade against and crush all public investors, whether bull or bear ETFs.

193.  To hide the actual price change and attract more public to trade the funds, in the 03/20/2020 Prospectus, Direxion provided three tables to compare the bull and bear funds for a 10-day short period trend:

Table 5  —  The Index Lacks a Clear Trend

| | | Index | | | Bull Fund | | | Bear Fund | |
|---|---|---|---|---|---|---|---|---|---|
| | Value | Daily Performance | Cumulative Performance | NAV | Daily Performance | Cumulative Performance | NAV | DailyPerformance | Cumulative Performance |
| | 100 | | | $100.00 | | | $100.00 | | |
| Day 1 | 105 | 5,00% | 5,00% | $110,00 | 10,00% | 10,00% | $90,00 | −10,00% | −10,00% |
| Day 2 | 110 | 4,76% | 10,00% | $120,48 | 9,52% | 20,47% | $81,43 | −9,52% | −18,57% |
| Day 3 | 100 | −9,09% | 0,00% | $98,57 | −18,18% | −1,43% | $96,23 | 18,18% | −3,76% |
| Day 4 | 90 | −10,00% | −10,00% | $78,86 | −20,00% | −21,14% | $115,48 | 20,00% | 15,48% |
| Day 5 | 85 | −5,56% | −15,00% | $70,10 | −11,12% | −29,91% | $128,31 | 11,12% | 28,33% |
| Day 6 | 100 | 17,65% | 0,00% | $94,83 | 35,30% | −5,17% | $83,03 | −35,30% | −16,97% |
| Day 7 | 95 | −5,00% | −5,00% | $85,35 | −10,00% | −14,65% | $91,33 | 10,00% | −8,67% |
| Day 8 | 100 | 5,26% | 0,00% | $94,34 | 10,52% | −5,68% | $81,71 | −10,52% | −18,28% |
| Day 9 | 105 | 5,00% | 5,00% | $103,77 | 10,00% | 3,76% | $73,54 | −10,00% | −26,45% |
| Day 10 | 100 | −4,76% | 0,00% | $93,89 | −9,52% | −6,12% | $80,55 | 9,52% | −19,45% |

The cumulative performance of the hypothetical underlying index in Table 5 is 0% for 10 trading days, The return of the hypothetical Bull Fund for the 10 trading day period is −6,12%, while the return of the hypothetical Bear Fund is −19,45%. The

Table 6  —  The Index Rises in a Clear Trend

| | Index | | | Bull Fund | | | Bear Fund | | |
|---|---|---|---|---|---|---|---|---|---|
| | Value | Daily Performance | Cumulative Performance | NAV | Daily Performance | Cumulative Performance | NAV | Daily Performance | Cumulative Performance |
| | 100 | | | $100,00 | | | $100,00 | | |
| Day 1 | 102 | 2,00% | 2,00% | $104,00 | 4,00% | 4,00% | $ 96,00 | –4,00% | –4,00% |
| Day 2 | 104 | 1,96% | 4,00% | $108,08 | 3,92% | 8,08% | $ 92,24 | –3,92% | –7,76% |
| Day 3 | 106 | 1,92% | 6,00% | $112,24 | 3,84% | 12,23% | $ 88,69 | –3,84% | –11,31% |
| Day 4 | 108 | 1,89% | 8,00% | $116,47 | 3,78% | 16,47% | $ 85,34 | –3,78% | –14,66% |
| Day 5 | 110 | 1,85% | 10,00% | $120,78 | 3,70% | 20,78% | $ 82,18 | –3,70% | –17,82% |
| Day 6 | 112 | 1,82% | 12,00% | $125,18 | 3,64% | 25,17% | $ 79.19 | –3,64% | –20,81% |
| Day 7 | 114 | 1,79% | 14,00% | $129,65 | 3,58% | 29,66% | $ 76,36 | –3,58% | –23,64% |
| Day 8 | 116 | 1,75% | 16,00% | $134,20 | 3,50% | 34,19% | $ 73,68 | –3,50% | –26,31% |
| Day 9 | 118 | 1.72% | 18.00% | $138,82 | 3,44% | 38.81% | $ 71.14 | –3,44% | –28.85% |
| Day 10 | 120 | 1,69% | 20,00% | $143,53 | 3,38% | 43,50% | $ 68,73 | –3,38% | –31,25% |

The cumulative performance of the hypothetical underlying index in Table 6 is 20% for 10 trading days. The return of the hypothetical Bull Fund for the 10 trading day period is 43,50%, while the return of the hypothetical Bear Fund ]s -31,25%. In this case, because of the positive hypothetical underlying index trend, the hypothetical Bull Fund's gain is greater than 200% of the hypothetical underlying index gain and the hypothetical Bear Fund's decline is less than –200% of the hypothetical underlying index gain for the 10 trading day period.

Table 7  —  The Index Declines in a Clear Trend

| | Index | | | Bull Fund | | | Bear Fund | | |
|---|---|---|---|---|---|---|---|---|---|
| | Value | Daily Performance | Cumulative Performance | NAV | Daily Performance | Cumulative Performance | NAV | Daily Performance | Cumulative Performance |
| | 100 | | | $100,00 | | | $100,00 | | |
| Day 1 | 98 | –2,00% | –2.00% | $ 96.00 | –4,00% | –4,00% | $104.00 | 4,00% | 4.00% |
| Day 2 | 96 | –2,04% | –4,00% | $ 92.08 | –4,08% | –7.92% | $108.24 | 4,08% | 8.24% |
| Day 3 | 94 | –2,08% | –6,00% | $ 88.24 | –4,16% | –11.75% | $112.76 | 4,16% | 12,75% |
| Day 4 | 92 | –2,13% | –8,00% | $ 84.49 | –4,26% | –15,51% | $117,55 | 4,26% | 17,55% |
| Day 5 | 90 | –2,17% | –10,00% | $ 80,82 | –4,34% | –19,17% | $122,66 | 4,34% | 22,65% |
| Day 6 | 88 | –2,22% | –12,00% | $ 77.22 | –4,44% | –22.76% | $128.12 | 4,44% | 28.10% |
| Day 7 | 86 | –2,27% | –14,00% | $ 73,71 | –4,54% | –26,27% | $133.94 | 4,54% | 33.91% |
| Day 8 | 84 | –2,33% | –16,00% | $ 70.29 | –4,66% | –29,71% | $140.17 | 4,66% | 40,15% |
| Day 9 | 82 | –2,38% | –18,00% | $ 66,94 | –4,76% | –33,05% | $146,84 | 4,76% | 46,82% |
| Day 10 | 80 | –2,44% | –20,00% | $ 63.67 | –4,88% | –36,32% | $154.01 | 4,88% | 53,99% |

The cumulative performance of the hypothetical underlying index in Table 7 is -20% for 10 trading days, The return of the hypothetical Bull Fund for the 10 trading day period is 36.32%, while the return of the hypothetical Bear Fund is 53.99%. In this case, because of the negative hypothetical underlying index trend, the hypothetical Bull Fund's decline is less than 200% of the hypothetical underlying index decline and the hypothetical Bear Fund's gain is greater than 200% of the hypothetical underlying index decline for the 10 trading day period.

194.  The tables show the bull and bear Funds strictly perform reversely in the short term.

195.  The 03/20/2020 Prospectus also provided a one-year long-term comparison of the

pair funds,

**Bull Fund**

| One Year Index Return | 200% One Year Index Return | Volatility Rate | | | | |
|---|---|---|---|---|---|---|
| | | 10% | 25% | 50% | 75% | 100% |
| -60% | -120% | -84.2% | -85.0% | -87.5% | -90.9% | -94.1% |
| -50% | -100% | -75.2% | -76.5% | -80.5% | -85.8% | -90.8% |
| -40% | -80% | -64.4% | -66.2% | -72.0% | -79.5% | -86.8% |
| -30% | -60% | -51.5% | -54.0% | -61.8% | -72.1% | -82.0% |
| -20% | -40% | -36.6% | -39.9% | -50.2% | -63.5% | -76.5% |
| -10% | -20% | -19.8% | -23.9% | -36.9% | -53.8% | -70.2% |
| 0% | 0% | -1.0% | -6.1% | -22.1% | -43.0% | -63.2% |
| 10% | 20% | 19.8% | 13.7% | -5.8% | -31.1% | -55.5% |
| 20% | 40% | 42.6% | 35.3% | 12.1% | -18.0% | -47.0% |
| 30% | 60% | 67.3% | 58.8% | 31.6% | -3.7% | -37.8% |
| 40% | 80% | 94.0% | 84.1% | 52.6% | 11.7% | -27.9% |
| 50% | 100% | 122.8% | 111.4% | 75.2% | 28.2% | -17.2% |
| 60% | 120% | 153.5% | 140.5% | 99.4% | 45.9% | -5.8% |

**Bear Fund**

| One Year Index Return | -200% One Year Index Return | Volatility Rate | | | | |
|---|---|---|---|---|---|---|
| | | 10% | 25% | 50% | 75% | 100% |
| -60% | 120% | 506.5% | 418.1% | 195.2% | 15.6% | -68.9% |
| -50% | 100% | 288.2% | 231.6% | 88.9% | -26.0% | -80.1% |
| -40% | 80% | 169.6% | 130.3% | 31.2% | -48.6% | -86.2% |
| -30% | 60% | 98.1% | 69.2% | -3.6% | -62.2% | -89.8% |
| -20% | 40% | 51.6% | 29.5% | -26.2% | -71.1% | -92.2% |
| -10% | 20% | 19.8% | 2.3% | -41.7% | -77.2% | -93.9% |
| 0% | 0% | -3.0% | -17.1% | -52.8% | -81.5% | -95.0% |

//Archives/edgar/data/0001424958/000119312520080736/d847016d497.htm

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

497

| 10% | -20% | -19.8% | -31.5% | -61.0% | -84.7% | -95.9% |
|---|---|---|---|---|---|---|
| 20% | -40% | -32.6% | -42.4% | -67.2% | -87.2% | -96.5% |
| 30% | -60% | -42.6% | -50.9% | -72.0% | -89.1% | -97.1% |
| 40% | -80% | -50.5% | -57.7% | -75.9% | -90.6% | -97.5% |
| 50% | -100% | -56.9% | -63.2% | -79.0% | -91.8% | -97.8% |
| 60% | -120% | -62.1% | -67.6% | -81.5% | -92.8% | -98.1% |

196.  In the tables, the pair funds perform reversely in the one-year term, showing very

promising investment functional returns for both bull and bear funds in long-term investment.

197.  Direxion tried to say that bull and bears funds will perform reversely in the short and long term.

198.  However, the bear leveraged funds also lose their value as quickly as the bull funds, in both the short and long term.

199.  See below charts that the pairs are in the same downtrend in the short and long term,



*NUGT returned -86.94%, and DUST returned -98.29% in five years, a very similar loss and a sure downtrend.*



*NUGT & DUST & JNUT & JDST trended perfectly same in 5 years*



200. In the maximum Return chart: NUGT & DUST & JNUT & JDST all trended down:

- ➤ **JDST: -100%:  -$889,990.02 Max To $9.98**
- ➤ **DUST: -99.93%, -$25,550.13 Max To $18.63**
- ➤ **JNUG: -99.76%  -$35,244.52 Max To $85.48**
- ➤ **NUGT: -99.92% -$77,960.11 Max To $59.89**

201. Tens of thousands of original investments in the Funds shrunk to merely zero. The defendants took advantage of SEC censorship and sponsorship by providing the pair of bull and bear funds, successfully cheated the public into buying long the Funds, and legally crushed the market.

202. Defendants collect profits as gambling house hosts and collect additional profits by trading against public investors. The losers are always general public investors.

**E.    Funds Never Met 2x Or 3x Price Target**

203. 2021 Summary Prospectus listed several risks to provide the reason for its price deviation from the underlined Index 3x or 2X target, including the Rebalancing Risk, Intra-Day Investment Risk, and Daily Index Correlation/Tracking Risk. It's normal for such Funds to face market risks, and the market can tolerate general price deviation. However, tracking the daily

prices, the gaps between the targeted price and final price were always abnormally significant, before or after the operational costs and all risks.

204. Costs are also admissible to be incurred in tracing the benchmark index. The Prospectus provided hypothetical, theoretical examples of fees and expenses that investors may encounter over 1-year and 3-year periods, but Direxion has never disclosed its daily costs and expenses. The general disclaimer cannot release its liability to specify the cost, tax, and marginal tax rate, especially since these Funds are leveraged, and the high daily operational cost and expenses alone are enough to compound the prices.

**F.     Marketing NUGT/JNUG/DUST/JDST as Gold ETFs**

205. NUGT/JNUG/DUST/JDST have a minimal relationship with gold futures or the gold mining industry; however, defendants put gold to their names and market them as gold ETFs/gold miner ETFs, which is also misleading.

206. The Funds may hold as little as 25% of their total asset in the GOLD mining sector index or and the Underlying Index may also keep as little as 25% of sector assets; thus, the total GOLD sector assets in NUGT may be as little sector assets as 0.25 X 0.25 = 0.0625, or 6.25%, according to February 2021 Direxion Statutory Prospectus as follows,

> *The Fund will concentrate its investment in a particular industry or group of industries (i.e., hold 25% or more of its total assets in the stocks of a particular industry or group of industries) to approximately the same extent as the Index is so concentrated.*

207. The NUGT will invest as low as 6.25% in the gold miner sector but still be named GOLD Miners Index ETF.

208. It means Direxion can invest most assets in anything, even real estate or family trust estates, but still name the funds as index ETFs, S&P ETFs, Gold ETFs, or any names they

want.

209. Ridiculously, Direxion invested many daily leveraged Funds in all kinds of names one can only imagine, such as Cyber Security 3X Funds, S&P Oil & Gas Exp. & Prod 3X Funds, including Bear & Bull, Direxion Auspice Broad Commodity Strategy ETF, Direxion MSCI USA ESG-Leaders vs. Laggards ETF. If they cannot find a name, they add some names under their existing 3X Funds, such as Direxion Flight to Safety Strategy ETF and Direxion World Without Waste ETF. Significantly, they need not change many positions to the new funds because the 25% and total 6.25% threshold are easy to meet.

210. The Fund invests "at least 80% of net assets in financial instruments, such as swap agreements, securities of the Index, and ETFs that not necessarily track the Index. The financial instruments are mostly "SWAP agreements and futures" or derivatives.

211. Derivatives are financial instruments that derive value from the underlying reference asset, such as stocks, bonds, funds (including ETFs), interest rates, or indexes. The term to hold these derivatives will be up to 397 days.

212. The NUGT is thus a derivative of derivatives, exposing all traders and investors to greater volatility, liquidity, and financial risks than all underlying derivatives.

213. Derivates are very specialized financial instruments and are generally not publicly traded. The derivatives of derivatives are even more technical than ever invented and shall not be sold to the general public.

214. Because most people believe that gold is a safe haven, the ETFs benefit from the "Gold" name to attract investor victims. The ETFs shall take "Gold" off its name.

**G.  Hedge against investors at daily closing.**

215. Direxion must constantly rebalance and readjust the closing price daily.

Defendants imposed all significant costs or losses into the closing prices, making them significantly deviate from the targeted leverage.

216. Defendants' rebalancing activities influenced the Funds' prices and hedged all investors' positions to its derivative contracts.

## H.     The problem of Derivative investments

217. The defendants invested in derivatives, including future contracts. The issue is that they invested in longer-dated futures, bringing the risk of prolonged contango. When futures expire, the Funds must constantly replace expiring futures with new ones, called "rolling." The Contango is riskier than shorter-dated futures. The funds are rolling their holdings and could lose significant money over time, and this loss is amplified in leveraged funds. All losses will be imposed on the Funds and are paid by investors.

## I.     Conclusion

218. Those misleading, fraudulent, and manipulative statements violated almost all securities laws, including the Securities Act Section 11(15 U.S.C. §775), Sections 9(a)(2) of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78i(a)(2)], Exchange Act Section 9(f) [15 U.S.C. § 78i(f)], Securities Act Section 15 (15 U.S.C. § 77o), Exchange Act Section 10(b) (15 U.S.C. § 78j(b)), Exchange Act Section 18(a) (15 U.S.C. § 78r(a)), Exchange Act Section 20(a) (15 U.S.C. § 78t(a)), Exchange Act Section 20A (15 U.S.C. § 78t-1(a)).

219. All the purported disclosures alleged above were materially false or misleading because they failed to disclose and intentionally hid the material information from the public.

220. The information is material because of a substantial likelihood that the reasonable investor would have viewed the disclosure of the omitted fact as having significantly altered the "total mix of information available." *Matrixx Initiatives, Inc. v. Siracusano,* 563 US 27, 38 (2011)

(quoting *Basic Inc. v. Levinson*, 485 US 224 (1988)).

221. The partially disclosed information was hard to say to be made by omission because it was material, and the defendants had the knowledge of all information while public investors had not. The statement makers may cure the omission by cautionary language. But a vague or blanket boilerplate disclaimer that warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the Prospectus which the plaintiffs challenge." *Slayton v. Am. Express Co.,* 604 F.3d 758, 772 (2d Cir. 2010) (quoting *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2009). See also *In re Aetna, Inc.* Sec. Litig., 617 F.3d 272, 282 (3d Cir. 2010) "Cautionary language must be extensive, specific, and directly related to the alleged misrepresentation.".

222. Defendants did list many risks in the Prospectus. Combined with false and misleading information, none have been specific and extensive enough to warn the investors of the real compounding effects, long-term downtrend, and short-term deviation from the underly indexes and price control. Mostly, the defendants used these easy and cheap warnings as a shield for Defendant's misrepresentation and price manipulation liabilities.

223. Defendants did not make false and misleading disclosure by omission, thus cannot cure by cautionary language.

224. The defendants have unique strategic advantages over the general public by withholding the necessary knowledge and information.

225. The knowledge is Fund design and operational knowledge, not generally to the collective knowledge of all the corporation's officers and employees acquired during their employment.

226. The company does not have a Common Law duty to disclose. However, a duty may arise when there is a corporate insider trading on confidential information or corporate statement that would otherwise be "inaccurate, incomplete, or misleading."

227. A fraud charge is maintainable where a party who knows material facts is under a duty, under the circumstances, to speak and disclose his information, but remains silent. Further, the common-law duty to disclose material facts to a stock purchaser arises from a partial disclosure or relaying half-truths.

228. If circumstances exist where the seller is particularly aware of an infirmity in the subject matter and the purchaser is not, the duty arises for the seller to disclose the material facts likely to affect the judgment of the purchaser in his decision on whether or not to complete the sale. There may also be a common-law duty to speak where the speaker learns that previous statements to a stock purchaser are false or have become false.

229. The Funds have been running billions of dollars and millions of trades every day. Those statements were made opposite the facts. Hiding the critical truth is thus part of the defendants' manipulative, fraudulent, and deceptive tactic in public purchasing or selling the ETF funds. They made wrongful statements intended to deceive the general public.

230. The individual trustees and managing officials who make or issue the statements, or order or approve it or it is making or issuance, or who furnish information or language for inclusion therein, are all responsible for such manipulative, fraudulent, or deceptive tactics.

231. Even if the statements in Prospectuses constituted opinions sincerely held by the defendants, they were still misleading, that "[A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion--or, otherwise put, about the speaker's basis for holding that view. And if the real facts

are otherwise but not provided, the opinion statement will mislead its audience. *Omnicare*, 135 S. Ct. at 1328. "[E]ven a statement which is true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation." See also *Kleinman v. Elan Corp.*, 706 F.3d 145 (2d Cir. 2013)

232. If defendants have disclosed that the Funds will permanently lose value, no investors will buy long the funds; if defendants have revealed that intraday trading will not follow the leveraged target, no traders will join the day-trading.

233. To attract more investors and traders, defendants intentionally hide the key facts and benefit from the misrepresentation by trading against investors and market price manipulation. Those behaviors were highly unreasonable and an extreme departure from the standards of ordinary care in information disclosure. The defendants made the statements with complete knowledge, thus intentionally and willfully.

234. The depictions in the official disclosures were directly opposite to the fact and went beyond mere misleading. Those statements were not made recklessly toward their falsity but by the defendants who knew they were wrong. The statements were made to attract more investors to invest the funds, either long-term, short-term or daily. The statements have caused almost all institutional and individual investors and traders to lose significant investment and fortune in the Funds trading and investment.

235. The facts make a strong inference that the defendants' intent could be imputed to the trust defendants, who were responsible for the statements made and were at least reckless toward the falsity of those statements. The misleading statement could not be the result of careless mistakes at the management level based on false information fed from below since it has more than twelve-year operating experiences in dozens of leveraged funds.

236. The statements made by Defendant Trust meet the requisite Rule 10(b) scienter.

237. Liability may arise from a company's failure to correct prior statements that were false or misleading. "[W]hen a company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently discovered information was not. The company then must correct the prior statement within a reasonable time." *Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1331 (7th Cir. 1995) (emphasis added).

238. "When a corporation speaks, volunteers, or discloses a fact, projection, or opinion about its operations, a duty arises for the corporation to ensure such information is not "so incomplete as to mislead." See *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (quoting *Backman v. Polaroid Corp*., 910 F.2d 10, 16 (1st Cir. 1990)).

239. Direxion has breached its promises and violated securities rules and laws, civilly and criminally, by using complicated public disclosure and mathematics tables, trading against public investors, and market price manipulation.

## II.        MARKET PRICE MANIPULATION

### A.    The Intraday Trade Price Control

240. Although they claimed to "seek the daily leveraged investment results, before fees and expenses, of 300% (or 200%) of the daily performance of the Index" in Prospectus and filings, the defendants control the Funds' price in day trading, making the investment results impossible.

241. The Funds cannot, and impossible to reach the leveraged index return in the daily trade until the pinpointed closing time because of the leveraged volatility compounding.

242. If not leveraged, the Funds are like balls in the field, kicked by the investors anywhere; if strictly leveraged, the compound will send intraday price to the moon.

243. Either way, the Funds price will significantly deviate from the underlying Index.

244. However, Direxion has to meet 3x or 2x leverage price at closing time; thus, it cannot let the price gap be too huge to be readjusted, or the ball is kicked too far to reach.

245. Defendants have no choice but to artificially or manually control the trend to make it similar to the underlying Index, make the closing price divergence smaller, or manipulate the price.

246. Direxion has never disclosed how it controls the daily trading prices and how to make these leveraged funds look like tracing the underlying index daily trading curve.

247. The Direxion named all these funds "Daily Funds" and "seek the daily leveraged investment results to benchmarked index." However, the Funds seek no leveraged return in intraday trading.

248. Traders, no matter institutions or individuals, who longed the funds wishing to follow the underlying Index have lost significant money in the defendants' day-trading rampage.

249. There is enormous profit in manipulating the price, giving the leverage and trade volume, as NUGT and JNUG are the market's most heavily traded leveraged funds.

250. Defendants know intraday price compounding deviates the Funds from the benchmark index and have never disclosed the information. Defendants know the intraday price and trend must be interfered with to make the closing gap smaller and interfere with them daily.

251. Defendants have been practicing this price manipulation for years; it is impossible to stop this, keep such inside information from leaking, and stop insiders from trading such price readjustment for personal benefit. It is hard to say that the defendants have never joined the short-term inside trading through third-party affiliates, individually, or by any other means.

252. Many market makers looked into the gap and caused a vast last-hour price swing. Defendants, their affiliates, or other market makers trade against public investors, short the Funds,

and have been grabbing colossal profit.

**B.**    **Closing Price Readjustment Manipulation**

253. Rafferty ordinarily executes transactions for a Fund "market-on-close" or "rebalance their portfolios once a daily" at the market closing (3/20/2020 Prospectus) in which funds purchasing or selling the same security receive the same closing price.

254. No matter where the balls are, the funds will inevitably be readjusted toward the 3x or 2x leveraged target at closing, opening the gate to price manipulation. This operation gives defendants unique control to make a profit in the last-hour price swing trade. As Defendants have to grab the ball at the closing time, the farther the balls are gone, the more significant the price gap, and the bigger the profit to make the closing readjustment.

255.    Generally, one hour before the closing time, defendants return to readjust the price toward the index price. With the proximate knowledge of price to close, defendants either short or long their position. The illegal profit can be substantial daily due to the trade's leverage and volume. Generally, when the ball goes too far in day trading, defendants will kick back the ball and let the price return.

256.    The SEC has notified Direxion to stop the last one-hour violent fluctuation. They have stopped the giant price swing but can never stop it. Instead, Direxion traded this last hour more secretly.

257. Some traders and market makers may have profited considerably in the last hour's price readjustment. General public traders cannot anticipate this sudden pre-closing price change on all technical standards. Defendants know such an inevitable price gap because they have been rebalancing and readjusting closing prices daily.

258. Defendants declared the closing readjustment in its SEC filings. The problem is not

the readjustment but the manipulation of intraday price and the way to fill the gap, the way that defendants throw the ball, and the way they set the target and collect the balls for their interest.

259. Defendants adjust and control intraday prices, artificially rebalance and readjust the closing prices based on the inside information, and disclose partial information to public investors. The intraday price control, closing prices, volatilities, compounding, daily trade strategy, and short-term and long-term price control are secret weapons of the defendants. Armed with inside information, Defendants have intentionally hidden material information, artificially manipulated the price, and caused loss and damages to the investors. Defendants thus committed market manipulation.

260. Given the leverage and volume of the Funds, it is hard to say that the defendants have never joined the short-term swing trade through third-party affiliates, individually, or by any other means.

## C.    <u>Short-term Price Control</u>

261. Unlike closing swing trade for price gap and trading hour price control, defendants also control the opening price and the pre-and after-market prices.

262. See below the table of the pre-market price gap and the after-market price gap.





263. In NUGT and JNUG 5-minute charts, some inter-day price gaps swing bigger than the whole trading day price range. These gaps were caused by pre- and after-hour trading.

264. Defendants have never disclosed whether his pre-market and after-market trading will also seek leverage price to the benchmarked Index.

265. The non-trading-hour performance shows little correlation with leverage and the underlying Index.

266. Pre- and after-market trading are the wildest trades, causing substantial price differences to the underlying Index, demanding more price control and bigger readjustment. The more price control and readjustment, the more defendants can make the predictable trend and profit. This manipulative trading practice is known as "marking-the-close." Defendants engaged in this marking-the-close scheme to serve its short-term trading scheme.

267. By engaging in this scheme, Defendant, directly and indirectly, has been involved in and, unless enjoined, will continue to engage in transactions, acts, practices, and courses of business which constitute and will constitute violations of Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 USC §§ 78i(a)(2), 78j(b)] and Rule 10b-5 [17 CFR § 240.10b-5.

268. Direxion has never disclosed such a non-market price target and mechanism.

269. In contrast to the profit made by Direxion and relevant market makers by price manipulation, almost all public traders and investors have lost substantial investments in these ETFs because defendants manipulate prices and trade against public investors.

270. By unreasonably hiding the operational information, controlling the intraday price and the trend curve to meet the benchmark index, and readjustment at closing time, defendants and all responsible personnel are liable for traders' loss. The Funds are deadly poisonous and dangerous in daily or short-term trading to public investors, whether institutional or individual. Many institutions have halted and severely curtailed their sale of non-traditional ETFs, and some brokers have forbidden their client's trading of Direxion leveraged funds. But most individual investors are still herded in.

## D.    Mid-Term Price Manipulation

271. Between April 10 and May 29, 2019. The NUGT closing price changed from $101.10 to $72.45, a 28% loss in 49 days or a potential short profit of 28% in 49 days.

272. See below Direxion's shorting profit collection period between 04/10/2019 - 05/29/2019:

| DATE | Index closing | Index | Index | NUGT Closing | NUGT open | NUGT Change | 3X Target | Difference |
|------|---------------|-------|-------|--------------|-----------|-------------|-----------|------------|
| May 29, 2019 | 569.60 | 569.10 | 0.06% | 72.45 | 73.00 | -0.28% | 0.18% | -0.46% |
| May 28, 2019 | 569.25 | 572.17 | -0.51% | 72.65 | 71.95 | -1.62% | -1.53% | 0.09% |
| May 27, 2019 | 572.15 | 572.17 | -0.09% | - | - | - | - | - |
| May 26, 2019 | - | - | - | - | - | - | - | - |
| May 25, 2019 | - | - | - | - | - | - | - | - |
| May 24, 2019 | 572.66 | 570.11 | 0.48% | 73.85 | 72.85 | 1.23% | 1.44% | -0.21% |
| May 23, 2019 | 569.90 | 568.98 | 0.15% | 72.95 | 73.70 | 1.25% | 0.45% | 0.8% |
| May 22, 2019 | 569.04 | 578.37 | -1.62% | 72.05 | 75.30 | -5.01% | -4.86% | -0.15% |
| May 21, 2019 | 578.40 | 576.71 | 0.32% | 75.85 | 73.80 | 0.53% | 0.96% | -0.43% |
| May 20, 2019 | 576.58 | 577.42 | -0.15% | 75.45 | 75.50 | -0.26% | -0.45% | 0.19% |
| May 19, 2019 | 577.46 | 577.42 | 0.08% | - | - | - | - | - |
| May 18, 2019 | - | - | - | - | - | - | | |
| May 17, 2019 | 577.02 | 575.13 | 0.27% | 75.65 | 73.15 | 1.75% | 0.81% | 0.94% |
| May 16, 2019 | 575.47 | 580.38 | -0.85% | 74.35 | 75.50 | -3.32% | -2.55% | -0.77% |
| May 15, 2019 | 580.41 | 581.90 | -0.26% | 76.90 | 78.10 | -0.45% | -0.78% | 0.33% |
| May 14, 2019 | 581.94 | 580.87 | 0.13% | 77.25 | 77.50 | -1.15% | 0.39% | -1.28% |
| May 13, 2019 | 581.18 | 566.51 | 2.61% | 78.15 | 75.10 | 9.38% | 7.83% | 1.55% |
| May 12, 2019 | 566.40 | 566.51 | -0.04% | - | - | - | | |
| May 11, 2019 | - | - | - | - | - | - | | |
| May 10, 2019 | 566.61 | 569.93 | -0.54% | 71.45 | 74.45 | -2.46% | -1.62% | -0.84% |
| May 09, 2019 | 569.70 | 571.61 | -0.37% | 73.25 | 74.10 | -0.75% | -1.11% | 0.36% |
| May 08, 2019 | 571.83 | 577.30 | -0.93% | 73.80 | 78.50 | -3.34% | -2.79% | -0.55% |
| May 07, 2019 | 577.22 | 566.70 | 1.85% | 76.35 | 72.95 | 6.12% | 5.55% | 0.57% |
| May 06, 2019 | 566.72 | 566.45 | 0.11% | 71.95 | 71.65 | -0.21% | 0.33% | -0.54% |
| May 05, 2019 | 566.09 | 566.45 | -0.14% | - | - | - | - | |
| May 04, 2019 | - | - | - | - | - | - | | |
| May 03, 2019 | 566.86 | 564.45 | 0.40% | 72.10 | 73.15 | 2.05% | 1.20% | 0.85% |
| May 02, 2019 | 564.60 | 573.72 | -1.65% | 70.65 | 72.50 | -5.17% | -4.95% | -0.22% |
| May 01, 2019 | 574.10 | 582.88 | -1.45% | 74.50 | 77.80 | -5.10% | -4.35% | -0.75% |
| April 30, 2019 | 582.52 | 581.86 | 0.12% | 78.50 | 77.90 | 0.26% | 0.36% | -0.10% |
| April 29, 2019 | 581.81 | 593.35 | -1.94% | 78.30 | 82.55 | -6.34% | -5.82% | -0.52% |
| April 28, 2019 | 593.35 | 593.35 | 0.01% | - | -- | - | | |
| April 27, 2019 | - | - | - | - | - | - | | |
| April 26, 2019 | 593.31 | 580.59 | 2.23% | 83.60 | 80.85 | 6.09% | 6.69% | -0.6% |
| April 25, 2019 | 580.39 | 583.74 | -0.64% | 78.80 | 81.45 | -2.11% | -1.92% | 0.19% |
| April 24, 2019 | 584.12 | 581.47 | 0.45% | 80.50 | 78.40 | 2.74% | 1.35% | 1.39% |
| April 23, 2019 | 581.51 | 586.96 | -0.91% | 78.35 | 77.60 | -2.37% | -2.73% | 0.36% |
| April 22, 2019 | 586.83 | 595.37 | -1.43% | 80.25 | 85.35 | -4.97% | -4.26% | 0.68% |
| April 21, 2019 | 595.36 | 595.37 | -0.02% | - | - | - | - | |
| April 20, 2019 | - | - | - | - | - | - | | |
| April 19, 2019 | - | - | - | - | - | - | | |
| April 18, 2019 | 595.46 | 603.43 | -1.35% | 84.45 | 87.85 | -4.68% | -4.35% | -0.33% |

| April 17, 2019 | 603.61 | 610.10 | -1.09% | 88.60 | 90.50 | -2.10% | -3.27% | 1.17% |
| April 16, 2019 | 610.25 | 619.41 | -1.48% | 90.50 | 92.10 | -5.63% | -4.44% | -1.19% |
| April 15, 2019 | 619.44 | 620.62 | -0.18% | 95.90 | 92.75 | 0.31% | -0.57% | -0.26% |
| April 14, 2019 | 620.58 | 620.62 | -0.02% | - | - | - | - | |
| April 13, 2019 | - | - | - | - | - | - | | |
| April 12, 2019 | 620.71 | 623.23 | -0.44% | 95.60 | 96.05 | -0.57% | -1.32% | 0.75% |
| April 11, 2019 | 623.46 | 631.84 | -1.26% | 96.15 | 97.45 | -4.90% | -3.78% | -1.12% |
| April 10, 2019 | 631.39 | 636.08 | -0.76% | 101.10 | 103.62 | -2.55% | -2.28% | -0.27% |

273. In the table: the price fluctuated in the $103.62 -$82.55 range between 04/10/2019 and 04/29/2019, then sharply slapped to $70s the next day.

274. The data showed the defendants' collection campaign, including swing trading and compounding trend trading.

275. Defendants can use all their intraday and short-term price manipulation to serve their mid-term price target.

276. Direxion manipulates mid-term price by random daily price divergence from the leverage target; see "Difference" in the table for how much Direxion missed leveraged price target.

277. Considering all elements in spectacular tracking divergence (the divergence of the performance of the Fund from that of the benchmark or Index), and mathematics pattern and costs and expenses, there is no explanation for such a big difference.

278. The only explanation is price manipulation.

279. Both Direxion and SEC set no cap or limit for such divergence.

280. The defendants Intentionally manipulate the prices.

**E.    Long-term Price Manipulation**

281. In all 2013 to 2021 Prospectuses, Direxion said the Fund is "not intended to be used by, and is not appropriate for, investors who do not intend to monitor and manage their portfolios actively." It is hard to say whether it was a sufficient disclosure or cautionary language. Of course,

everybody will actively monitor and manage portfolios, and the language alarmed no risk at all.

282. The same 02/28/2020 NUGT Prospectus explained,

*"In light of the financing charges and each Bull Fund's operating expenses, the expected return of a Bull Fund* **over one trading day is equal to the gross expected return,** *which is the daily underlying index return multiplied by a Bull Fund's daily leveraged investment objective, minus (i) financing charges incurred by the portfolio and (ii) daily operating expenses."*

283. This language denied compounding and misled the investors that any longer-term return would be leveraged after the expenses.

284. Direxion uses pair funds to attract the general public to hold a longing position in either bull or bear position. But the pair funds will continue both trends down, no matter which side or no matter the direction of the benchmark index.

285. Direxion used the average annualized volatility rate and the annualized return rate to attract investors and traders into the calculated trap.

286. It used short-term and mid-term price manipulation, cost compounding, forward slip and reverse slip to serve its long-term target.

287. It deviates from the daily leveraged price to serve its long-term price target.

288. It further marketed itself as a GOLD miners ETF to attract more gold investors.

289. Adding all together, the Fund will inevitably slip to the downside in the long-term, and defendants can trade against the investors to short the funds.

290. Defendants are making promised shorting tools that public investors cannot anticipate.

291. The prices of the NUGT have gone down more than 99.2%. The original investment shrunk thousands of times, which means 1250 times of quick profit in merely holding shorting position without margin, and tens or hundreds of times more, if with margin.

292.    With a sure downtrend and manipulation tactics with inside information and the money involved, Direxion cannot say it has not joined the manipulation or say it has no control of the manipulation in options, futures, or other tradings.

## G.    Direxion has seldom met its daily leveraged index price change.

293. The Direxion promised that NUGT and DUST seek daily investment results, before fees and expenses, of either 200%, or 200% of the inverse (or opposite), of the performance of the NYSE Arca Gold Miners Index. Through March 31, 2020, the Funds sought daily leveraged investment results, before fees and expenses, of 300% of the performance of the NYSE Arca Gold Miners Index. The actual trading prices of the funds deviate much from their 3X or 2X targets. As the fact sheets claim annual funding expenses, the Net Expense Ratio would be 0.90% for NUGT and 0.91% for DUST.

294. The 2020 Summary Prospectus shows the total "Annual Fund Operating Expenses for the NUGT is 1.14%. (Fees and expenses that you may pay if you buy, hold, and sell shares of the Fund ("Shares"))."

295. Even after expenses, the closing-to-closing price change rates do not match the Index change rate. Comparing the prices as follows, there has no single day exactly met the targeted target,

| D  a  t  e | Index Closing | Index OPEN | Index Change | NUGT closing | NUGT open | NUGT change | 3X Target |
|---|---|---|---|---|---|---|---|
| July    29, | 846.91 | 826.82 | 2.45% | 642.04 | 642.04 | 8.15% | 7.35% |
| July    28, | 826.69 | 822.47 | 0.62% | 593.64 | 593.64 | -0.29% | 1.96% |
| July    27, | 821.62 | 792.67 | 3.68% | 595.36 | 595.36 | 13.60% | 11.04% |
| July    26, | 792.47 | 774.99 | 2.31% | 524.08 | 524.08 | 7.62% | 6.93% |
| July    25, | 774.56 | 801.79 | -3.08% | 486.96 | 486.96 | -10.57% | -9.24% |
| July    24, | 799.16 | 801.79 | -0.26% | 544.52 | | | -43.56-% |
| July    22, | 801.24 | 799.79 | 0.16% | 548.20 | 544.52 | -0.67% | 0.48% |
| July    21, | 799.97 | 782.40 | 2.21% | 501.04 | 548.20 | 9.41% | 6.63% |
| July    20, | 782.67 | 825.81 | -5.21% | 607.40 | 501.04 | -17.51% | -15.63% |
| July    19, | 825.68 | 834.55 | -1.06% | 627.84 | 607.40 | -3.26% | -3.18% |

| July | 18, | 834.53 | 830.78 | 0.00% | 619.12 | 627.84 | 1.41% | 0.00% |
|------|-----|--------|--------|-------|--------|--------|-------|-------|
| July | 17, | 834.53 | 830.78 | 0.46% | 640.36 | | | 1.38% |
| July | 15, | 830.73 | 840.39 | -1.16% | 649.68 | 619.12 | -3.32% | -3.48% |
| July | 14, | 840.52 | 843.05 | -0.37% | 594.48 | 640.36 | -1.43% | -1.11% |
| July | 13, | 843.67 | 822.99 | 2.50% | 671.68 | 649.68 | 9.29% | 7.50% |
| July | 12, | 823.13 | 851.24 | -3.32% | 666.72 | 594.48 | -11.49% | -9.96% |
| July | 11, | 851.38 | 845.52 | 0.00% | 609.76 | 671.68 | 0.74% | 0.00% |
| July | 10, | 851.38 | 845.52 | 0.70% | 670.84 | | | 2.10% |
| July | 08, | 845.49 | 827.06 | 2.19% | 615.12 | 666.72 | 9.34% | 6.57% |
| July | 07, | 827.38 | 847.01 | -2.31% | 577.84 | 609.76 | -9.11% | -6.93% |
| July | 06, | 846.97 | 819.46 | 3.26% | 504.48 | 670.84 | 9.06% | 6.78% |
| July | 05, | 820.27 | 809.03 | --% | 477.92 | 615.12 | 6.45% | 0.00% |
| July | 04, | 820.27 | 809.03 | 2.03% | 450.60 | | | 6.09% |
| July | 01, | 803.98 | 769.66 | 4.48% | 472.68 | 577.84 | 14.54% | 13.44% |
| June | 30, | 769.52 | 759.09 | 1.40% | 456.04 | 504.48 | 5.56% | 4.20% |
| June | 29, | 758.86 | 741.87 | 2.40% | 387.92 | 477.92 | 6.06% | 7.20% |
| June | 28, | 741.07 | 752.02 | -1.42% | 399.76 | 450.60 | -4.67% | -4.26% |
| June | 27, | 751.75 | 741.75 | 0.00% | 374.92 | 472.68 | 3.65% | 0.00% |
| June | 26, | 751.75 | 741.75 | 1.15% | 409.08 | | | 3.45% |
| June | 24, | 743.21 | 703.00 | 5.56% | 416.40 | 456.04 | 17.56% | 16.68% |
| June | 23, | 704.07 | 706.58 | -0.31% | 402.96 | 387.92 | -2.96% | -0.93% |
| June | 22, | 706.29 | 697.34 | 1.26% | 444.44 | 399.76 | 6.63% | 3.78% |
| June | 21, | 697.51 | 712.16 | -2.07% | 398.00 | 374.92 | -8.35% | -6.21% |
| June | 20, | 712.28 | 713.09 | -0.02% | 425.60 | 409.08 | -1.76% | -0.06% |
| June | 17, | 712.40 | 713.23 | 0.07% | 427.51 | 416.40 | 3.34% | 0.21% |
| June | 16, | 711.90 | 725.46 | -1.86% | 446.88 | 402.96 | -9.33% | -4.58% |

296. The most recent price deviate days were between 02/25/2020 to 03/30/2020.

| D a t e | Index Closing | Index OPEN | Index Change | NUGT closing | NUGT open | NUGT change | 3X Target | c o m m e n t s |
|---------|---------------|------------|--------------|--------------|-----------|-------------|-----------|-----------------|
| March 30, 2020 | 678.33 | 681.92 | -0.58% | 36.15 | 38.25 | 375.66% | -1.74% | Split adjust |
| March 28, 2020 | - | - | - | 7.60 | 7.60 | -80.00% | 0% | Split adjust |
| March 27, 2020 | 682.30 | 723.34 | -5.53% | 38.00 | 42.25 | -16.02% | -16.69% | |
| March 26, 2020 | 722.25 | 723.57 | -0.49% | 45.25 | 49.95 | -3.42% | -1.47% | |
| March 25, 2020 | 725.84 | 709.59 | 3.23% | 46.85 | 44.90 | 8.57% | 9.69% | |
| March 24, 2020 | 703.13 | 621.73 | 14.52% | 43.15 | 41.85 | 36.98% | 43.56% | |
| March 23, 2020 | 614.00 | 581.78 | 5.35% | 31.50 | 31.00 | 488.79% | 16.05% | Split adjust |
| March 21, 2020 | | | | 5.35 | 5.35 | -80.00% | | Split adjust |
| March 20, 2020 | 582.80 | 611.27 | -4.55% | 26.75 | 38.05 | -13.57% | -13.65% | |
| March 19, 2020 | 610.58 | 601.64 | 0.55% | 30.95 | 31.10 | -14.97% | 1.65& | |
| March 18, 2020 | 607.23 | 685.02 | -10.57% | 36.40 | 64.50 | -49.34% | -31.71% | |
| March 17, 2020 | 678.97 | 617.63 | 11.06% | 71.85 | 51.45 | 38.04% | 33.18% | |
| March 16, 2020 | 611.36 | 577.47 | 4.46% | 52.05 | 26.00 | 669.97% | -13.44% | Split adjust |
| March 14, 2020 | - | - | - | 6.76 | 6.76 | -80.00% | | Split adjust |
| March 13, 2020 | 585.27 | 635.92 | -9.19% | 33.80 | 74.60 | -46.35% | -27.57% | |
| March 12, 2020 | 644.52 | 710.46 | -10.14% | 63.00 | 72.95 | -36.33% | -30.42% | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| March 11, 2020 | 717.22 | 764.19 | -6.67% | 98.95 | 122.90 | -23.09% | -20.01% | |
| March 10, 2020 | 768.49 | 767.58 | -0.47% | 128.65 | 133.15 | -0.85% | -1.41% | |
| March 09, 2020 | 772.10 | 826.77 | -6.47% | 129.75 | 146.25 | -19.66% | -19.41% | |
| March 06, 2020 | 825.54 | 833.15 | -0.52% | 161.50 | 171.00 | -3.78% | -1.56% | |
| March 05, 2020 | 829.88 | 814.50 | 2.00% | 167.85 | 162.90 | 6.91% | 6% | |
| March 04, 2020 | 813.57 | 805.57 | 1.57% | 157.00 | 156.25 | 4.25% | 4.71% | |
| March 03, 2020 | 800.96 | 768.15 | 4.53% | 150.60 | 138.00 | 14.79% | 13.59% | |
| March 02, 2020 | 766.25 | 741.48 | 3.03% | 131.20 | 127.65 | 13.59% | 9.09% | |
| February 28, | 743.69 | 789.98 | -6.76% | 115.50 | 126.17 | -21.96% | -20.28% | |
| February 27, | 797.60 | 838.42 | -4.97% | 148.00 | 185.00 | -16.53% | -14.91% | |
| February 26, | 839.30 | 841.61 | -0.52% | 177.30 | 177.75 | -0.98% | -1.56% | |
| February 25, | 843.69 | 866.35 | -3.20% | 179.05 | 188.50 | -10.30% | -9.6% | |
| February 24, | 871.60 | 862.05 | 1.60% | 199.60 | 212.70 | 4.01% | 3.8% | |
| February 21, | 857.84 | 832.50 | 3.05% | 191.90 | 184.80 | 8.85% | 9.15% | |
| February 20, | 832.49 | 833.38 | 0.07% | 176.30 | 175.00 | -0.09% | 0.21% | |
| February 19, | 831.89 | 821.37 | 1.75% | 176.45 | 169.75 | 5.60% | 5.25% | |
| February 18, | 817.56 | 791.66 | 3.22% | 167.10 | 157.18 | 448.23% | 9.66% | Split adjust |
| February 17, | | | | 30.48 | 30.48 | -80.00% | | Split adjust |
| February 14, | 792.06 | 792.54 | -0.33% | 152.40 | 153.00 | -0.39% | -0.99% | |
| February 13, | 794.71 | 787.85 | 0.83% | 153.00 | 152.90 | 2.10% | 2.49% | |

•*On 03/23/2020, the NUGT price change was 488.79%, while the index change was 5.35%.*

•*On 03/21/2020, the NUGT price change was -80%, while the index change was 0%, while the Index had no trading on that date.*

•*On 03/18/2020, the NUGT price change was -49.34%, while the index change was -10.57%.*

• *On 03/16/2020, the NUGT price change was 669.97%, while the index change was 4.46%.*

•*On 03/14/2020, the NUGT price change was -80%, while the index change was 0%, while the Index had no trading on that date.*

•*On 03/13/2020, the NUGT price change was -46.35%, while the index change was -9.19%.*

297. This table also shows Direxion's pattern to collect its shorting profits generally happens after it reaches a short-term high in a swing trading period.

H.    **Stock Reverse or Forward Split for Special Price Control**

298. On February 24, 2010, NUGT declared a reverse split: 5 into 1.

299. For a regular reverse stock split, the holding position's total value will not change because when the price ups five times, the stock numbers shrink five times.

300. The period between 02/25/2020 and 03/30/2020 is after NUGT's reverse split 25 for 1 on 02/24/2020. The price changed from $188.5 to $36.15 (price readjusted considering the splitting effect), lower than one-fifth of the original price.

| Date | Index | Index | Index | NUGT | NUGT | NUGT | 3X | comments |
|------|-------|-------|-------|------|------|------|-----|----------|
| March 30, 2020 | 678.33 | 681.92 | -0.58% | 36.15 | 38.25 | 375.66% | -1.74% | Split adjust |
| March 28, 2020 | - | - | - | 7.60 | 7.60 | -80.00% | 0% | Split adjust |
| March 27, 2020 | 682.30 | 723.34 | -5.53% | 38.00 | 42.25 | -16.02% | -16.69% | |
| March 26, 2020 | 722.25 | 723.57 | -0.49% | 45.25 | 49.95 | -3.42% | -1.47% | |
| March 25, 2020 | 725.84 | 709.59 | 3.23% | 46.85 | 44.90 | 8.57% | 9.69% | |
| March 24, 2020 | 703.13 | 621.73 | 14.52% | 43.15 | 41.85 | 36.98% | -43.56-% | |
| March 23, 2020 | 614.00 | 581.78 | 5.35% | 31.50 | 31.00 | 488.79% | -16.05% | Split adjust |
| March 21, 2020 | | | | 5.35 | 5.35 | -80.00% | | Split adjust |
| March 20, 2020 | 582.80 | 611.27 | -4.55% | 26.75 | 38.05 | -13.57% | -13.65% | |
| March 19, 2020 | 610.58 | 601.64 | 0.55% | 30.95 | 31.10 | -14.97% | 1.65& | |
| March 18, 2020 | 607.23 | 685.02 | -10.57% | 36.40 | 64.50 | -49.34% | -31.71% | |
| March 17, 2020 | 678.97 | 617.63 | 11.06% | 71.85 | 51.45 | 38.04% | 33.18% | |
| March 16, 2020 | 611.36 | 577.47 | 4.46% | 52.05 | 26.00 | 669.97% | -13.44% | Split adjust |
| March 14, 2020 | - | - | - | 6.76 | 6.76 | -80.00% | | Split adjust |
| March 13, 2020 | 585.27 | 635.92 | -9.19% | 33.80 | 74.60 | -46.35% | -27.57% | |
| March 12, 2020 | 644.52 | 710.46 | -10.14% | 63.00 | 72.95 | -36.33% | -30.42% | |
| March 11, 2020 | 717.22 | 764.19 | -6.67% | 98.95 | 122.90 | -23.09% | -20.01% | |
| March 10, 2020 | 768.49 | 767.58 | -0.47% | 128.65 | 133.15 | -0.85% | -1.41% | |
| March 09, 2020 | 772.10 | 826.77 | -6.47% | 129.75 | 146.25 | -19.66% | -19.41% | |
| March 06, 2020 | 825.54 | 833.15 | -0.52% | 161.50 | 171.00 | -3.78% | -1.56% | |
| March 05, 2020 | 829.88 | 814.50 | 2.00% | 167.85 | 162.90 | 6.91% | 6% | |
| March 04, 2020 | 813.57 | 805.57 | 1.57% | 157.00 | 156.25 | 4.25% | 4.71% | |
| March 03, 2020 | 800.96 | 768.15 | 4.53% | 150.60 | 138.00 | 14.79% | 13.59% | |
| March 02, 2020 | 766.25 | 741.48 | 3.03% | 131.20 | 127.65 | 13.59% | 9.09% | |
| February 28, | 743.69 | 789.98 | -6.76% | 115.50 | 126.17 | -21.96% | -20.28% | |
| February 27, | 797.60 | 838.42 | -4.97% | 148.00 | 185.00 | -16.53% | -14.91% | |
| February 26, | 839.30 | 841.61 | -0.52% | 177.30 | 177.75 | -0.98% | -1.56% | |
| February 25, | 843.69 | 866.35 | -3.20% | 179.05 | 188.50 | -10.30% | -9.6% | |
| February 24, | 871.60 | 862.05 | 1.60% | 199.60 | 212.70 | 4.01% | 3.8% | |
| February 21, | 857.84 | 832.50 | 3.05% | 191.90 | 184.80 | 8.85% | 9.15% | |
| February 20, | 832.49 | 833.38 | 0.07% | 176.30 | 175.00 | -0.09% | 0.21% | |
| February 19, | 831.89 | 821.37 | 1.75% | 176.45 | 169.75 | 5.60% | 5.25% | |
| February 18, | 817.56 | 791.66 | 3.22% | 167.10 | 157.18 | 448.23% | 9.66% | Split adjust |
| February 17, | | | | 30.48 | 30.48 | -80.00% | | Split adjust |
| February 14, | 792.06 | 792.54 | -0.33% | 152.40 | 153.00 | -0.39% | -0.99% | |
| February 13, | 794.71 | 787.85 | 0.83% | 153.00 | 152.90 | 2.10% | 2.49% | |

301. The prices in the form are adjusted prices considering the reverse split. Thus, the prices represent the actual market price change without considering the split result.

302. In 497 (Prospectus) of filed (2020-04-08), as Supplement dated April 08, 2020, to the Summary Prospectuses, Prospectuses, and Statements of Additional Information ("SAI"), Direxion declared again reverse split and explained as follows,

The Board of Trustees of the Direxion Shares ETF Trust ("Trust") has approved, based on the recommendation of Rafferty Asset Management, LLC, the investment adviser to the Funds, reverse splits of the issued and outstanding shares of the Funds.

After the close of the markets on April 22, 2020 (the "Record Date"), each Fund will affect reverse splits of its issued and outstanding shares as follows:

| Fund Name | Reverse Split Ratio | Approximate decrease in total number of outstanding shares |
|---|---|---|
| Direxion Daily MSCI Brazil Bull 2X Shares | 1 for 35 | 97% |
| Direxion Daily Junior Gold Miners Index Bear 2X Shares | 1 for 25 | 96% |
| Direxion Daily Gold Miners Index Bear 2X Shares | 1 for 25 | 96% |
| Direxion Daily Technology Bear 3X Shares | 1 for 10 | 90% |
| Direxion Daily Regional Banks Bull 3X Shares | 1 for 10 | 90% |
| Direxion Daily S&P 500 High Beta Bull 3X Shares | 1 for 10 | 90% |
| Direxion Daily 20+ Year Treasury Bear 3X Shares | 1 for 10 | 90% |
| Direxion Daily Junior Gold Miners Index Bull 2X Shares | 1 for 10 | 90% |
| Direxion Daily Robotics, Artificial Intelligence & Automation Index Bull 3X Shares | 1 for 10 | 90% |
| Direxion Daily Retail Bull 3X Shares | 1 for 10 | 90% |
| Direxion Zacks MLP High Income Index Shares | 1 for 8 | 88% |
| Direxion Daily Gold Miners Index Bull 2X Shares | 1 for 5 | 80% |

*As a result of these reverse splits, every thirty-five, twenty-five, ten, eight, or five shares of a Fund will be exchanged for one share, as indicated in the table above. Accordingly, the total number of the issued and outstanding shares for a Fund will decrease by the approximate percentage shown above. In addition, the per share net asset value ("NAV") and the next day's opening market price will be approximately thirty-five-, twenty-five-, ten-, eight-, or five times higher for the Funds. Shares of the Funds will begin trading on the NYSE Arca, Inc. (the "NYSE Arca") on a split-adjusted basis on April 23, 2020.*

*The next day's opening market value of the Funds' issued and outstanding shares, and __thus a shareholder's investment value, will not be affected by the reverse split__. The tables below illustrate the effect of a hypothetical one-for-thirty-five, one-for-twenty-five, one-for-ten, one-for-eight, and one-for-five reverse split anticipated for the Funds, as described above.*

1-for-10 Reverse Split

| Period | # of Shares Owned | Hypothetical NAV | Total Market Value |
|---|---|---|---|
| Pre-Split | 100 | $ 10 | $1,000 |
| Post-Split | 10 | $100 | $1,000 |

303. Direxion promised no change in the value of the Funds by the reverse split, only a difference in the number of shares.

304. By February 24, 2020, NUGT's price after the reverse split had been up for five consecutive days to push prices as high as **$199.60** to attract more long-side investors, then sharply slid to **$26.75** on March 20, 2020. By this reverse split, Defendants could easily make $172.85 in shorting profit in each share, an 86.6% shorting profit in 26 days, not counting the shorter period swing.

305. All holding positions will lose $86.6% of an investment, leaving only 13.4% of the investment.

306. Using the fake reverse split, the defendants lowered the NUGT value more than five times after the price adjustments, collecting 86.6% shorting profit in face value. Defendants could make more because the price swung bigger on some days than the final period numbers.

307. NUGT made share numbers 25 times less in its reverse split, but the prices are also five times less. NUGT made a five-time share number reverse split and a five-time price split in one claimed split.

308. Plaintiff had $39,188.7 in his account on 01/31/2020 but ended with $4,054.99 on 03-31-2020, a loss totaling $36,462.99, or 89.99% shrunk, without any trading. See the chart below,



*chart showing a value drop because of the reverse split, 1/10 of the original value without any trade.*



*This chart showed no trading during the Period of 02/01/2020 to 03/31/2020.*

309.    Nobody can grab money quicker than defendants, not even a bank robber. By changing leverage from 2-time to 3-time and back to 2-time, the defendants robbed all investors of all money when the money remained in the Funds during the splits.

I.    **Defendant Grabbed Tremendous Illegal Fortune by Its Illegal Operation**

310.  The Fund has shrunk 99.94% in its value, which means more than 1250 times of shorting profit; the intraday price control provides an ample profit space for price manipulation; the pre-closing price adjustment provides an ample profit space for price manipulation; the pre-market and after-market trading provides an ample profit space for price manipulation; the short-term and middle-term market making leaves ample profit space for price manipulation;

311.  As a result, Direxion increased its management assets from $6.2 billion as of 10/31/09 to approximately $24.3 billion as of March 31, 2021.

312.  Given the defects of the fund design and ample space for inside money-making, the trading volume and amounts of funds, and the fact that the defendants intentionally hid all the key facts, they cannot say they have not joined the inside trading.

III.    **Loss Causation**

313.  The defendants made false and misleading statements and engaged in the scheme to deceive the market and artificially control the Funds' prices. The plaintiff purchased the funds substantially by the defendant's misrepresentation of the Funds' prospects. As a result of the purchase of the Funds, the plaintiff suffered economic loss, i.e., damages, under the laws.

IV.    **NO SAFE HARBOR AND STRONG INFERENCE OF SCIENTER**

314.  Defendants' "Safe Harbor" warnings in their public filings cannot shield them from liability.

315.  The defendants are also liable for any false or misleading statements in public filings because these statements are material to the purchaser's trade or investment decision; at the time of the statements, the filing defendants knew the statements were false or misleading. The authorized executive officer defendants also knew the statements were false. The knowledge was

formed in the Funds design and operational experience over ten more years and hundreds of funds' filings.

316. An opinion may be misleading even if sincerely held. The statements in the Prospectus were not sincerely because the defendants had known the disclosed information was not true in design and actual operation. Defendants failed to adequately label the statements as forward-looking; the statements further could not be identified as forward-looking, and warnings were boilerplate language or partial historical events or numbers; defendants knew that the statements were false when they made them; thus, the safe harbor warnings cannot shield Direxion from liability.

317. Defendants had the motive and opportunity to commit fraud because they "benefitted in some concrete and personal way from the alleged fraud, such as unusual profiting from insider trading" (Novak v. Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000)). As we can find that the managing assets in the Funds had increased remarkably. They created numerous opportunities for inside trading and price manipulation. They actually and artificially controlled and manipulated the actual trading hourly, daily, and all the time. They have no choice but to manipulate the price because of the underlying unresolvable paradox in wrongful design of the Funds. Regarding the opportunity prong, courts often assume that corporations and corporate officers and directors would have the opportunity to commit fraud if they so desired (Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006)). Defendants' Conscious misbehavior "encompasses deliberate illegal behavior, such as securities trading by insider's privy to undisclosed and material information, or the knowing sale of a company's stock at an unwarranted discount." Defendants' behaviors were Recklessness because the conducts were 'highly unreasonable' after the price dropped 1250 times without disclosure.

The defendants manipulated prices for days and years, which represents 'an extreme departure from the standards of ordinary care … to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" It is "not merely a heightened form of negligence." (Novak, 216 F.3d at 308, 312 (internal citations omitted).)

## COUNT I

### (Violations of §11 of the Securities Act Against All Defendants)

71.    This Count is brought pursuant to Section 11 of the Securities Act of 1933 (15 U.S.C. §77s) against all Defendants.

72.    Plaintiff incorporates by reference the above paragraphs as if set forth herein.

73.    Direxion is the issuer of the JNUG & NUGT and other Funds shares sold via the Registration Statement and Amendments. The Individual Defendants are signatories or authorizers of the Registration Statement and Amendments.

74.    Direxion is liable for material misstatements and omissions from the Registration Statement and Amendments. The other Defendants owed investors a duty to make a reasonable investigation of registration disclosure to ensure statements were true and no omission of material fact was provided, and the statements were not seriously misleading. These Defendants designed or joined the design of the Funds and, under reasonable care, knew or should have known of the material misstatements and omissions in the Registration Statement and Amendments.

75.    As signatories to and authorized agents, the individual Defendants owed Plaintiff and all investors a duty to ensure that public disclosures were true and that there was no omission of material facts and no misleading in the Statements.

76.    As alleged, each defendant violated or violated Section 11 of the Securities Act through controlled people. As a direct and proximate result, Plaintiff and the public investors

suffered substantial damages in the trade.

77.    The Funds were purchased pursuant and traceable to the Registration Statement, Amendments, or relevant filings; thus, the reliance was presumed.

78.    Plaintiff and public investors do not know the untruths or omissions. They could not have reasonably discovered those facts when they made the purchase, as the defendants promised in the Registration of negative management to follow the indices strictly. Defendants' material misstatements thus damaged Plaintiff in the Registration Statement, Amendments, or other filings.

79.    Less than one year had elapsed from when Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff filed this Complaint. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this Complaint.

## COUNT II

### (Violations of § 18(a) of the Securities Act Against All Defendants)

80.    This Count is brought pursuant to Section 18(a) of Exchange Act, 15 U.S.C. § 78r(a), against all Defendants.

81.    Plaintiff incorporates by reference the above paragraphs as if set forth herein.

82.    Direxion is the issuer of the JNUG & NUGT and other Funds shares sold via the Registration Statement and Amendments. The Individual Defendants are signatories or authorizers of the Registration Statement and Amendments.

83.    Direxion's false and misleading statements in the Registration, amendment, and relevant filings caused Plaintiff and public investors to purchase and sell the funds.

84.    Plaintiff traded the funds by believing and relying on the filing statements and investing all his savings. Plaintiff invested more than $1.05 million in TD Ameritrade account, $150,000.00 in Interactive Broker's account, and $80,000.00 in Charles Schwab. He finally held his position in the Charles Schwab account for about five years, believing that the statements that the Funds' price may go higher if the underlying benchmark were in his favor. Plaintiff lost most investment when the underlying gold index rose from $1,100.00 to $1,800.00. Plaintiff thus suffered trade or investment loss by Defendants' misconduct and material misstatements in the Registration and relevant filings.

85.    Less than two years had elapsed from when Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff filed this Complaint (28 U.S.C. § 1658(b)). Less than three years had elapsed between the time the securities were sold and when Plaintiff filed this Complaint. Less than two years had elapsed from when Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff filed this Complaint. Less than five years have elapsed between the time the fraud acts are giving rise to claims and the time Plaintiff filed this Complaint, as required by Section 804 of the Sarbanes-Oxley Act.

## **COUNT III**
### **(Violations of §  10(b) of the Exchange Act and Rule 10-5 Against all Defendants)**

86.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.    This Count is asserted against Direxion, the Individual Defendants, and all affiliated companies and is based upon Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17

C.F.R. § 240.10b-5] promulgated thereunder by the SEC, see also *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730-31 (1975)).

88.    During the Period, Plaintiff and other public investors are buyers or sellers of the Funds whose purchase or sale was affected by the defendants' fraudulent actions.

89.    Direxion and the Individual Defendants, individually and in concert, directly or indirectly, knowingly or recklessly engaged in acts and transactions at all times to affect the funds' price, under a plan, scheme, and conspiracy, as a fraud and deceit upon Plaintiff and public investors. Direxion and the Individual Defendants filed, assisted the filing, or approved the false statements, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary for public investment artificially control and manipulate the Funds' price.

90.    Throughout the Period, Direxion and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to deceive the investing public, including Plaintiff and other public investors; (ii) made untrue statements of material facts or omitted to state material facts to make the purchasers believe the Statement; or (iii) artificially control, traded and maintain the market price of the Funds; and (iv) cause Plaintiff to purchase or otherwise acquire Funds at artificially inflated or deflated prices and suffered loss and damages; (v) Such fraud and deceit caused loss and damage to Plaintiff.

91.    Each defendant joined the actions herein in furtherance of the unlawful scheme.

92.    All named Defendants acted with the scienter in that they knew that the SEC filings were materially false and misleading and knowingly and substantially participated or acquiesced in the filing of such Statement. The information was acquired by Defendants in participating Funds

designing and operation, received as the facts of the Trust, developed through their control, acquired or participated in each amendment filing of materially misleading statements, by and their associations with Direxion privy to confidential, proprietary information, by acting as agents or legal counsel in defending and participating in the fraudulent scheme alleged herein.

93. The Direxion and the Individual Defendants acted with scienter in price control that they knew the intraday price must be controlled to meet closing price readjustment, and knowingly and substantially participated or acquiesced in the control of intraday price, pre-closing short swing price manipulation, and other short-term, middle-term, long-term price manipulation, forward and reverse split frauds, as direct violations of the securities laws.

94. As a result of the preceding, the defendants artificially manipulated the market price of Funds during the Period. As a result of the defendant's false and misleading statements, Plaintiff relied on the statements and believed in the integrity of the market price of Funds during the Period of purchasing Funds at artificially manipulated prices.

95. As a result, Direxion increased its assets from $6.2 billion under management as of 10/31/09 to approximately $24.3 billion as of March 31, 2021. Other defendants have not disclosed their assets but would have benefited tremendously from their violation behaviors or otherwise from the inside trading.

96. Had Plaintiff been aware of Funds' artificial price manipulation, the intentionally concealed fact or falsity in filing statements, they would not have purchased Funds at the artificially controlled prices.

97. As a result of the wrongful conduct alleged herein, the original value of the Funds shrunk thousands of times, and Plaintiff had suffered damages in an amount to be established at

trial.

98.    Because of the preceding, all defendants have violated the laws promulgated thereunder and are liable to Plaintiff for substantial damages they suffered in connection with their purchases of Funds during the Period.

99.    At the time of their purchases of Funds shares, Plaintiff was unaware of the facts concerning the alleged wrongful conduct and could not have reasonably discovered those facts. Less than two years had elapsed from when Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff filed this Complaint. Less than five years have elapsed between the time that the fraud acts are giving rise to claims and the time Plaintiff filed this Complaint.

## COUNT IV
### (Violations of § 9(a)(2) and 9(f) of the Exchange Act Against all Defendants)

100.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.   This Count is asserted against Direxion, the Individual Defendants, and all affiliated companies and is based upon Sections 9(a)(2) of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78i(a)(2)], Exchange Act Section 9(f) [15 U.S.C. § 78i(f)].

102.   Direxion and the Individual Defendants violated § 9(a)(2) and 9(f) of the 1934 Act in that they:

- Employed devices, schemes, and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts to make the purchasers believe the Statement, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, transactions, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and other purchasers during the Period.

- Plaintiff relied on the defendants' acts and suffered loss and damages.
- Such fraud and deceit caused loss and damage to Plaintiff.

103.   As a result of the wrongful conduct alleged herein, Plaintiff has suffered damages in an amount to be established at trial.

104.   Because of the preceding, all defendants have violated the laws promulgated thereunder and are liable to Plaintiff for substantial damages they suffered in connection with their purchases of Funds during the Period.

105.   At the time of their purchases of Funds shares, Plaintiff was unaware of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts. Less than one year had elapsed from when Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff filed this Complaint. Less than three years have elapsed between the time that the Frauds occurred and the time Plaintiff filed this Complaint.

## COUNT V
### (Violations of §  20A of the Exchange Act)

106.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

107.   This Count is asserted against Direxion, the Individual Defendants, and all affiliated companies and is based upon Exchange Act Section 20A [15 U.S.C. § 78t-1(a)].

108.   Direxion and the Individual Defendants violated §20(a) of the 1934 Act in that they:

- Are insiders of the Trust or companies of the Funds owing a fiduciary duty.
- Employed devices, schemes, and artifices to defraud.
- Violated Exchange Act Section 10(b) and 9(f) by trading and manipulating intraday, pre-closing, pre-market, and after-market prices while possessing material nonpublic information.
- Traded or otherwise artificially controlled the price contemporaneously with

plaintiffs and public investors.
- Made untrue statements of material facts or omitted to state material facts; or
- engaged in acts, transactions, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and other purchasers during the Period.
- Plaintiff relied on the defendants' acts and suffered loss and damages.
- Such fraud and deceit caused loss and damage to Plaintiff.
- Acted with scienter, with the knowledge that such acts or conducts were wrongful and intent to act despite this knowledge.

109.    Because of the foregoing, all defendants have violated the laws promulgated thereunder and are liable to the Plaintiff for substantial damages he suffered in connection with their purchases of Funds during the Period.

110.    At the time of their purchases of Funds shares, Plaintiff was without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts. Less than five years have elapsed from the time that the last transaction of the securities that are the subject of this action occurred to the time that Plaintiff filed this Complaint.

## **COUNT VI**

### **(Violations of § 15 of the Securities Act Against the Individual Controlling Defendants, Individual Managerial Defendants, and Rafferty)**

111.    Plaintiff incorporates by reference the above paragraphs as if set forth herein. This Count is asserted against the Individual Controlling Defendants and Rafferty.

112.    The controlled persons caused the underlying primary violations of section 11 or 12.

113.    Each Individual Controlling Defendants, Individual Managerial Defendants, Legal Counsels, and Rafferty acted as a controlling person of Direxion under Section 15 of the Securities Act. They were also trustees, directors, officers, or legal representatives of Direxion charged within the legal responsibility of supervision. Each had influenced and exercised power

to engage in the unlawful conduct complained of herein.

114.     For such reason, the Individual Controlling Defendants, Individual Managerial Defendants named, and Rafferty in this Count are liable pursuant to Section 15 of the Securities Act.

## COUNT VII

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Controlling Defendants, Individual Managerial Defendants, and Portfolio Managers

115.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

116.     This Count is asserted against Direxion, the Individual Defendants, and all affiliated companies and is based upon Exchange Act Section 20A [15 U.S.C. § 78t(a)].

117.     As officers and directors, or day-to-day managers of public traded Funds, or legal representatives, Individual Controlling Defendants, Individual Managerial Defendants, and Portfolio Managers had a duty to disseminate accurate and truthful information with respect to the Funds and to correct promptly any public statements issued by the Direxion which had become materially false or misleading.

118.     Because of their positions of control and authority as senior officers or legal representatives, the Individual Controlling Defendants, Individual Managerial Defendants, Portfolio Managers, and legal counsel controlled the public filings during the Period. Throughout the Period, the Individual Defendants exercised their power and authority to cause the Trust to engage in the wrongful acts complained of herein. The Individual Controlling Defendants, Individual Managerial Defendants, and Portfolio Managers, therefore, were "controlling persons"

of the Trust within the meaning of Section 20(a) of the Exchange Act. And the Legal Counsels culpably participated within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Lion securities.

119.    By reason of the above conduct, the Individual Controlling Defendants, Individual Managerial Defendants, and Portfolio Managers are liable pursuant to the laws for the violations committed by the Company. As a direct and proximate result of their wrongful conduct, Plaintiff suffered losses and damages in connection with their purchases of shares of the JNUG & NUGT in amounts to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Disgorgement of defendants' ill-gotten profits.

B.    Awarding monetary damages for the benefit of the bargain and anticipated investment return to Plaintiff's original investment which will not exceed the profits gained by the defendant under Section 20A.

C.    awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    awarding punitive damages;

E.    granting permanent injunctive relief to remove all Funds from the market;

F.    awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G.    such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: August 30, 2022

Respectfully submitted

/s/ Lee Xu
Lee Xu
Xu Law Offices P.C.
136-18 39th Avenue, Suite 1003
Flushing, NY 11354
929-200-7166

## PLAINTIFF'S CERTIFICATION

Lee Xu ("Plaintiff") hereby states that:

1.    Plaintiff has reviewed the Complaint and filed the Complaint on his behalf.

2.    Plaintiff did not purchase any share of the NUGT/JNUG at the direction of any third party or in order to commence this private action.

3.    The following includes some of Plaintiff's transactions in the Fund during the Period specified in the Complaint.

**See Schedule A attached hereto.**

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of August 2022.


_____/s/ Lee Xu_____
                Lee Xu

**SCHEDULE A – NUGT/JNUG/JDST/DUST Transactions**

|  | SYMBOL | Purchase time | Sold time | loss |
|---|---|---|---|---|
| Charles Schwab | NUGT | 04/23/2020 reverse split | 06/28/2022 | -$3,837.37 |
|  | JNUG | 04/23/2020 reverse split | 06/28/2022 | -$79732.64 |
|  | JNUG | 03/31/2017 | 04/30/2017 | -$5438.00 |
|  | NUGT | 03/31/2017 | 04/30/2017 | -$95.16 |
| TD Ameritrade | NUGT | Plaintiff has invested $1,050,000.00 into Funds day-trading. The total transaction-based loss would be aggregated to several million, adding up all separate individual trading. | | |
|  | JNUG | | | |
|  | JDST | | | |
|  | DUST | | | |
| Interactive Brokers | NUGT | Plaintiff has invested $150,000.00 into Funds day trading, and the total transaction-based loss would be aggregated to several million, adding up all separate individual trading. | | |
|  | JNUG | | | |
|  | JDST | | | |
|  | DUST | | | |

*Plaintiff is ready to provide all transaction statements.*